**REVISED**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-11140
_____


In the Matter of: NATIONAL
GYPSUM COMPANY, a Delaware
Corporation; AANCOR HOLDINGS, INC.,
a Delaware Corporation,

                                        Debtors

                -----------------------

INSURANCE COMPANY OF NORTH AMERICA,

                                        Appellant,

     versus

NGC SETTLEMENT TRUST & ASBESTOS CLAIMS
MANAGEMENT CORPORATION,

                                        Appellee.


_____

        Appeal from the United States District Court for the
                    Northern District of Texas
_____

                        July 24, 1997
Before GARWOOD, BENAVIDES and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:

     Appellees Asbestos Claims Management Corporation (ACMC) and
the NGC Settlement Trust (Trust), successors to National Gypsum
Company, a Chapter 11 debtor, brought this declaratory judgment
adversary proceeding in the bankruptcy court seeking a declaration
that collection efforts by National Gypsum's liability insurance

carrier, appellant Insurance Company of North America (INA), seeking to recover certain pre-confirmation debts were violative of the Chapter 11 discharge injunction or otherwise precluded by the terms of the Chapter 11 confirmed reorganization plan. INA filed a motion to stay ACMC and the Trust's adversary proceeding in favor of arbitration pursuant to the terms of a contractual arbitration clause. The Bankruptcy Court, holding that it had discretion to refuse to order the arbitration of core bankruptcy matters, denied the motion to stay. INA appealed. The district court affirmed. INA now appeals to this Court. We affirm.

### Facts and Proceedings Below

As this appeal involves the application of an arbitration provision in a contract assumed by National Gypsum Company pursuant to its confirmed plan of reorganization, a brief synopsis of National Gypsum's journey through the bankruptcy process is appropriate.

National Gypsum, a Delaware corporation with its principal place of business in Garland, Texas, was a manufacturer and supplier of products and services for the building, construction, and shelter markets. Through its various divisions, National Gypsum manufactured, sold, and distributed products serving the residential, commercial, industrial, and repair and remodeling markets. National Gypsum also performed engineering and construction services. Historically, some of the products manufactured by National Gypsum contained asbestos.

Beginning in the 1970s, National Gypsum, as well as many other

2

producers of asbestos-containing products, were named as defendants in many lawsuits across the country involving bodily-injury claims. INA was one of National Gypsum's insurers.[1]  On June 19, 1985, as a result of the plethora of asbestos bodily-injury lawsuits and in recognition of various insurance coverage disputes, National Gypsum entered into an agreement (the Wellington Agreement) with sixteen property and casualty insurers and thirty-three former asbestos products producers regarding the handling of asbestos-related bodily-injury claims.  The Wellington Agreement established the Asbestos Claims Facility to evaluate, defend, and settle all pending, threatened, and future asbestos bodily-injury claims presented to it by the signatory producers and to pay settlements, judgments (except for portions of awards attributable to punitive damages), and legal expenses incurred in the defense of all asbestos bodily-injury claims advanced against the signatory producers.

The Wellington Agreement, among other things, called for signatory insurers to advance liability payments on behalf of participating asbestos producers for amounts covered by insurance contracts issued by nonsignatory insurers.[2]  Signatory producers

_____

[1]     Century Indemnity Company, successor to CCI Insurance Company (which was the successor to INA), has assumed INA's interest in this adversary proceeding.  Century is an indirect, wholly-owned subsidiary of CIGNA Corporation.

[2]      More precisely, the Wellington Agreement provided:

  "3.  Whenever an insurance policy described in Paragraph 1 hereinabove [an insurance policy issued by a non-signatory insurer] would have had to make payments or to pay expenses on a particular claim under the Agreement

3

who benefitted from such payments were required by the Wellington Agreement to pursue claims against the nonsignatory insurers, to repay the amounts advanced by the signatory insurers, and to pay interest on the amounts advanced beginning two years after the date the payments were made.[3]

During the relevant period, on several occasions and in amounts not material to this appeal, INA contends that it advanced payments on behalf of National Gypsum for amounts owed by National Gypsum's nonsignatory insurers. ACMC and the Trust do not contest that these payments were made on National Gypsum's behalf.

On October 28, 1990, National Gypsum and Aancor Holdings, Inc. (a Delaware corporation and 100% owner of National Gypsum's outstanding shares) filed voluntary petitions for bankruptcy protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

National Gypsum and Aancor filed a "Debtors' First Amended and

---

had the Insurer in question become a signatory hereto,
and the Subscribing Producer has not received monies from such non-signatory Insurer pursuant to Paragraphs 1 and 2 hereinabove, each insurance policy in the coverage block covering a part of the exposure period for such claim shall make payments and pay expenses, subject to applicable limits of liability, on a pro rata basis in lieu of the non-signatory insurance policy and to the extent that such insurance policy would have had to make payments under the Agreement, up to the applicable limits of such insurance policy . . . ." Wellington Agreement ¶ XX(3).

[3] Wellington Agreement ¶ XX(1),(4). The Asbestos Claims Facility was dissolved on October 3, 1988. The parties agree that the Wellington Agreement remains operative between and among the signatory producers (including National Gypsum) and the signatory insurers (including INA) with respect to insurance coverage issues resolved therein.

Restated Joint Plan of Reorganization" dated September 4, 1992. The Bankruptcy Court entered an order confirming the reorganization plan on March 9, 1993. Pursuant to the reorganization plan and the confirmation order, National Gypsum assumed the Wellington Agreement.[4] INA neither objected to, nor appealed, the Bankruptcy Court's confirmation of the reorganization plan.[5]

National Gypsum's reorganization plan called for the establishment of a qualified settlement fund under section 468B of the Internal Revenue Code (the "NGC Settlement Trust (Trust)"), which became the sole shareholder of the reorganized National

---

[4]     Paragraph 7.1 of the reorganization plan assumed those executory contracts set forth in the "Schedule of Executory Contracts" (annexed to the plan as Exhibit F). Exhibit F lists the Wellington Agreement under Paragraph VII (Asbestos-Related Agreements) with a prepetition balance of zero and an "[i]ndefinite" term.
    As discussed below, this appeal involves neither a determination of the "cure" amount (if any) required to assume the Wellington Agreement under section 365 of the Bankruptcy Code, nor the amount (if any) of interest owed by National Gypsum at any time——either pre- or post-confirmation——under the Wellington Agreement.

[5]     INA, however, has maintained consistently that it was never given the requisite notice for assumption of the Wellington Agreement. The Bankruptcy Court, in a subsequent ruling, rejected INA's notice argument and observed that National Gypsum provided INA with notice of the hearing to approve the disclosure statement, and that the notice contained the last date for objections to the disclosure statement. The disclosure statement, as usual, included, as "Annex 1," the reorganization plan that was ultimately confirmed by the Bankruptcy Court. The plan, as noted above, listed the Wellington Agreement as an executory contract to be assumed in Exhibit F.
    The Bankruptcy Court ruled that, under our opinion in *In re Christopher*, 28 F.3d 512, 517 (5th Cir. 1994), INA had sufficient notice to permit it to object to the cure amount under section 365.
    The merit of INA's notice objection to the assumption of the Wellington Agreement is also not before this Court in the present appeal.

Gypsum (which, in turn, became known as "Asbestos Claims Management Corporation (ACMC)").

In a letter to the Trust dated July 12, 1995, INA demanded payment of $3,866,055, representing the amount purportedly advanced under paragraph XX(3) of the Wellington Agreement, plus $1,027,118 accrued interest under paragraph XX(4). INA's demand letter stated that, if payment were not received within thirty days, INA would "institute formal proceedings to collect the amount due." In a letter to INA dated October 9, 1995, counsel for the Trust and ACMC stated their position that the confirmed reorganization plan had discharged National Gypsum "from the obligations asserted in the Demand Letter" and admonished INA that post-confirmation collection efforts were violative of the section 524(a) discharge injunction, section 6.5 of the reorganization plan, and section 8(a) of the confirmation order. INA, through counsel, repeated its demand in a letter dated October 13, 1995. INA asserted that, as the Wellington Agreement was assumed by the reorganized National Gypsum (ACMC) rather than assigned to the "New NGC," the obligations were not subject to discharge.

On October 20, 1995, ACMC and the Trust filed this adversary proceeding-declaratory judgment complaint against INA in the National Gypsum Company Chapter 11 case in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. The complaint alleged that National Gypsum's confirmed

reorganization plan barred INA's collection efforts[6] and sought declarations from the court that (1) INA was barred from obtaining recovery by operation of the Bankruptcy Code[7] and that (2) no assets of the Trust be permitted to satisfy INA's claims regardless of ACMC's liability.[8]  The complaint asserted no other defenses to

---

[6]

> "The Trust and ACMC contend that INA is barred from obtaining recovery for some or all of the alleged acceleration interest arising under Section XX of the Wellington Agreement from the Trust and ACMC pursuant to the discharge and other provisions of the Bankruptcy Code, the Plan and the order of this Court confirming the Plan (the "Confirmation Order").  Recovery by Defendant Insurer of alleged acceleration interest from the Trust or ACMC would be contrary to the provisions of the Bankruptcy Code, including without limitation Sections 524 and 1141 thereof, and would defeat the purposes of the confirmed Plan and of the Trust formed pursuant to the Plan.  Confirmation of the Plan is binding on all parties affected by the Plan, including without limitation INA, and constitutes res judicata as to INA. The Trust and ACMC also contend that INA, the Defendant Insurer, has been enjoined under applicable provisions of the Bankruptcy Code and of the Plan and this court's Confirmation Order from obtaining such alleged acceleration interest.  INA is estopped from claiming such alleged acceleration interest."  Complaint ¶ 20.

[7]

> "The Trust and ACMC seek a declaration from the Court under 28 U.S.C. §§ 2201-2202, declaring that INA, the Defendant Insurer, is barred and enjoined pursuant to the Bankruptcy Code, the Plan and the Confirmation Order from obtaining recovery from either the Trust or ACMC from [sic] any interest arising under Section XX of the Wellington Agreement that accrued from insurer payments made prior to March 9, 1993 [the date of confirmation]."  Complaint ¶ 23.

[8]

> "The Trust and ACMC seek a declaration from the Court under 28 U.S.C. §§ 2201-2202 declaring that regardless of the contractual liability of ACMC, if any, under Section XX of the Wellington Agreement, no assets of the Trust may be used to satisfy the claims of INA, the Defendant Insurer, with respect to any interest arising under

the Trust and ACMC's liability for the amounts set forth in INA's demand letter other than those premised on the operation of the confirmed reorganization plan and the injunctions provided by the Bankruptcy Code; other issues, such as ACMC and the Trust's liability for post-confirmation date interest, the proper calculation of interest under the Wellington Agreement, and equitable defenses to collection were not addressed by the complaint. ACMC and the Trust sought attorneys' fees and costs.

On December 4, 1995, counsel for INA sent a letter to the CPR Institute for Dispute Resolution requesting immediate docketing of the dispute between INA, ACMC, and the Trust, citing the alternative dispute resolution provisions of the Wellington Agreement. That same day, in lieu of an answer, INA also filed a motion in the Bankruptcy Court seeking, alternatively, abstention in favor of arbitration (28 U.S.C. § 1334(c)(1)), a stay pending arbitration (9 U.S.C. §§ 1-3), or a dismissal for lack of subject matter jurisdiction (28 U.S.C. § 1334(b); 28 U.S.C. § 157(c)(1)).

On January 26, 1996, the Bankruptcy Court entered an order denying INA's motion. The Bankruptcy Court found that, as the adversary proceeding sought to ascertain whether its Confirmation Order and the reorganization plan precluded INA's claim, it had "core" jurisdiction under 28 U.S.C. §§ 157 (b)(2)(B) and (C). The Bankruptcy Court, further observing that its jurisdiction was concurrent (rather than exclusive), stated that ordinarily, given

Section XX of the Wellington Agreement that accrued from insurer payments made prior to March 9, 1993, pursuant to the Plan and the Conformation Order." Complaint ¶ 26.

8

the passage of time after the substantive consummation of the confirmed plan, it would have abstained in favor of the nonbankruptcy forum (where ACMC and the Trust could have asserted bankruptcy discharge, the discharge injunction, and res judicata as affirmative defenses). The Bankruptcy Court, however, noted the absence of ongoing arbitration proceedings and found that bankruptcy court was the most efficient forum to determine the issue raised in the complaint. Accordingly, the Bankruptcy Court refused to abstain or to stay the adversary proceeding pending arbitration.[9]

INA appealed the denial of its motion for a stay pending arbitration under the Federal Arbitration Act (the Act), 9 U.S.C. § 3, to the District Court. INA argued that the Bankruptcy Court applied an incorrect standard for determining whether to grant a motion to stay under the Act, that the Bankruptcy Court had a duty to grant a stay pending arbitration, and that the Bankruptcy Court did not have core jurisdiction over the adversary proceeding. The District Court affirmed the Bankruptcy Court, holding that the issues raised in the declaratory judgment action were "core" bankruptcy matters and that the Bankruptcy Court had discretion to refuse to order arbitration of core bankruptcy matters. INA now appeals to this Court the denial of its motion to stay under the

---

[9] The Bankruptcy Court, citing 28 U.S.C. § 1334(c)(2), noted that mandatory abstention did not apply to a declaratory judgment action raising a core matter.

Act.[10]  We affirm.

## Discussion

Although this appeal arises out of a dispute between INA and ACMC and the Trust about whether, and to what extent, National Gypsum's confirmed reorganization plan bars post-confirmation collection efforts by INA for National Gypsum's alleged pre-confirmation liability to INA under the Wellington Agreement, the merits of that dispute are not before this Court.  Rather, this appeal concerns only the Bankruptcy Court's determination that, assuming the Wellington Agreement's arbitration provision can be read broadly enough to cover the present dispute, it nevertheless had discretion to decide not to stay the adversary proceeding pending arbitration under the Act.

A bankruptcy court's refusal to stay an adversary proceeding pending arbitration, though inherently interlocutory in nature, is nevertheless appealable because of section 16 of the Federal Arbitration Act.  Section 16, by providing that an appeal may be taken from an order "refusing a stay of any action under section 3," 9 U.S.C. § 16(a)(1)(A),[11] promotes arbitration "'by permitting

---

[10]    Although INA, in its brief to this Court, stated that "[t]his appeal only addresses the denial of [INA's] motion to stay in favor of arbitration," it listed the Bankruptcy Court's determination that it possessed core bankruptcy jurisdiction as an issue on appeal and presented arguments in support of that issue.

[11]    Section 16 of the Federal Arbitration Act provides:

"(a) An appeal may be taken from—
    (1) an order—
        (A) refusing a stay of any action under section 3 of this title,
        (B) denying a petition under section 4 of this

interlocutory appeals of orders favoring litigation over arbitration and precluding review of interlocutory orders that favor arbitration,'" *McDermott Int'l, Inc. v. Underwriters at Lloyd's Subscribing to Memorandum of Ins. No. 104207*, 981 F.2d 744, 746-47 (5th Cir. 1993) (quoting *Forsyth Int'l, S.A. v. Gibbs Oil Co.*, 915 F.2d 1017, 1020 (5th Cir. 1990)); *see also American Cas. Co. of Reading, Pa. v. L-J Inc.*, 35 F.3d 133, 135 (4th Cir. 1990) ("It matters not whether these orders [refusing arbitration] are final or interlocutory because orders that favor litigation over arbitration are '*immediately* appealable, even if interlocutory in nature.'") (citation omitted).  Accordingly, this Court has jurisdiction over INA's appeal.

## I.

INA contends that the Bankruptcy Court erred by concluding

title to order arbitration to proceed,
        (C) denying an application under section 206 of this title to compel arbitration,
        (D) confirming or denying confirmation of an award or partial award, or
        (E) modifying, correcting, or vacating an award;
     (2) an interlocutory order granting, continuing, or modifying an injunction against an arbitration that is subject to this title; or
     (3) a final decision with respect to an arbitration that is subject to this title.
(b) Except as otherwise provided in section 1292(b) of title 28, an appeal may not be taken from an interlocutory order—
     (1) granting a stay of any action under section 3 of this title;
     (2) directing arbitration to proceed under section 4 of this title;
     (3) compelling arbitration under section 206 of this title; or
     (4) refusing to enjoin an arbitration that is subject to this title."  9 U.S.C. § 16.

11

that ACMC's declaratory judgment action constituted a core issue under 28 U.S.C. § 157(b)(2)(B)&(C),[12] and argues that ACMC's declaratory judgment action was instead a preemptive assertion of a federal defense to a state law contract claim. A bankruptcy court's conclusion that a proceeding is "core" under 28 U.S.C. § 157(b) is a question of law which this Court reviews *de novo*. *In re United States Abatement Corp.*, 79 F.3d 393, 397-98 & n.9 (5th Cir. 1996). INA first argues that ACMC and the Trust are attempting to utilize the Declaratory Judgment Act to transform an affirmative defense of discharge in bankruptcy into a federal cause of action "arising under" title 11. In support of its argument, INA cites *Skelly Oil Co. v. Phillips Petroleum Co.*, 70 S.Ct. 876, 878-79 (1950), and *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 103 S.Ct. 2841, 2849-50 (1983), for the proposition that, as federal defenses to state law actions do not "arise under" federal law for the purpose of federal question jurisdiction even when asserted in a declaratory judgment complaint, the discharge injunction granted pursuant to National Gypsum's confirmed reorganization plan cannot confer "arising under" core bankruptcy

---

[12] 28 U.S.C. § 1334(b) confers on the federal district courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising or related to cases under title 11." 28 U.S.C. § 157(b)(1) gives bankruptcy judges the power to determine "all core proceedings arising under title 11, or arising in a case under title 11" and to enter appropriate judgments and orders. 28 U.S.C. § 157(b)(2) provides a nonexclusive list of core proceedings, two of which the Bankruptcy Court (and the District Court) found applicable. *Id.* § 157(b)(2)(B) ("allowance or disallowance of claims against the estate"); *id.* § 157(b)(2)(C) ("counterclaims by the estate against persons filing claims against the estate").

12

jurisdiction under sections 157(b) and 1334.  INA contends that *Skelly* and *Franchise Tax Board* required the Bankruptcy Court to realign the parties as if ACMC were asserting discharge as a defense to a state law contract action brought by INA.

INA also argues that any affirmative right conferred by 11 U.S.C. § 524(a)[13] does not confer an independent federal cause of action.  INA cites *Fabrique, Inc. v. Corman*, 813 F.2d 725, 726 (5th Cir. 1987), for the proposition that "an action for a declaratory judgment stating a preemptive bankruptcy defense to a state law claim [does] not constitute a cause of action for the purpose of federal jurisdiction."

ACMC and the Trust counter that a proceeding to determine whether a creditor violated section 524(a)'s discharge injunction, the reorganization plan, or the confirmation order is a core

---

[13]     Section 524(a) provides a debtor with a post-discharge injunction against the collection of debts discharged in bankruptcy:

"(a) A discharge in a case under this title——
. . . .
     (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived . . . ."  11 U.S.C. § 524(a)(2).

Section 1141(d) discharges a Chapter 11 debtor (with certain exceptions) from preconfirmation debts:

"(d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan——
     (A) discharges the debtor from any debt that arose before the date of such confirmation . . . ."  11 U.S.C. § 1141(d)(1)(A).

proceeding under section 157(b) and that INA's reliance on declaratory judgment/federal question cases is inapposite. ACMC and the Trust first argue that *In re Wood*'s statement that "a proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case," 825 F.2d 90, 97 (5th Cir. 1987), is controlling because their claim that INA violated the discharge injunction "invokes a substantive right provided by title 11." Similarly, ACMC and the Trust contend that their claim that INA also violated the reorganization plan and the confirmation order could arise only in the context of a bankruptcy case. ACMC and the Trust dispute INA's position that a discharge in bankruptcy, though a potential affirmative defense in a civil proceeding, cannot also confer positive rights under section 524.

ACMC and the Trust finally argue that the section 524(a) discharge injunction grants a federal right to be free of collection efforts—an independent basis for federal bankruptcy jurisdiction—that does not rely improperly on the Declaratory Judgment Act, 28 U.S.C. § 2201, as a basis for federal jurisdiction. ACMC and the Trust distinguish *Fabrique* as a case involving a nonbankrupt, declaratory judgment plaintiff who premised federal jurisdiction on the federal question statute, 28 U.S.C. § 1331, advancing 11 U.S.C. § 363(m)'s warrant of title to good faith purchasers as the only federal issue. Accordingly, they argue that the 11 U.S.C. § 363(m) right at issue in *Fabrique*,

14

unlike the 11 U.S.C. § 524(a) discharge injunction, can arise only as a defense. ACMC and the Trust contend that the declaratory judgment action concerning section 524(a) involves only an interpretation of the reorganization plan and the confirmation order to determine whether the debt asserted by INA is owed under the confirmed plan; as the merits of INA's claims under the Wellington Agreement were not implicated by their complaint, they argue that the adversary proceeding involves only a determination of their federal rights under the Bankruptcy Code.

The discharge injunction granted by section 524(a) is a substantive right conferred by the Bankruptcy Code, often enforced by a motion for contempt, *see, e.g.*, *In re Texaco*, 182 B.R. 937, 944 (Bankr. S.D.N.Y. 1995) ("There can be no question that a proceeding such as this [motion for contempt], to enforce and construe a confirmation order issued by this Court in this case, constitutes a proceeding 'arising in or related to a case under title 11.'"), but also enforceable through a declaratory judgment action, *see, e.g.*, *In re Christopher*, 148 B.R. 832, 833 & n.2 (Bankr. N.D. Tex. 1992) (reorganized Chapter 11 debtor's declaratory judgment adversary proceeding seeking a declaration that certain claims asserted in lawsuits were barred by 11 U.S.C. § 1141(d) was a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (O)), *aff'd*, 28 F.3d 512 (5th Cir. 1994); *In re Pettibone Corp.*, 151 B.R. 166, 169-70 (Bankr. N.D. Ill. 1993) (resolution of declaratory judgment action brought by Chapter 11 plaintiff to declare a personal injury claim discharged and collection efforts

15

violative of section 524(a) "affect[ed] the allowance of claims and the administration of the estate [and] was a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B)"). Courts have held that actions to enforce the discharge injunction are core proceedings because they call on a bankruptcy court to construe and enforce its own orders. *In re Polysat*, 152 B.R. 886, 888 (Bankr. E.D. Pa. 1993) ("As the instant proceeding concerns the scope of the discharge injunction arising from sections 524 and 1141 of the Code, it is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (I), or (O)."); *In re Jacobs*, 149 B.R. 983, 989 (Bankr. N.D. Okla. 1993) ("An action before the Court which issued a discharge, for the purpose of determining the scope of said discharge under 11 U.S.C. § 524 . . . is not merely related to the bankruptcy, but arises under Title 11, and arises in a case under Title 11, is a 'proceeding . . . affecting . . . the adjustment of the debtor-creditor relationship,' and is therefore a core proceeding under 28 U.S.C. §§ 157(b)(2)(O)."); *cf.* 4 *Collier on Bankruptcy* ¶ 524.02[2][c], at 524-18 ("A proceeding to enforce the discharge injunction is a core proceeding under section 157(b)(2)(O) of title 28, and courts should readily reopen a closed bankruptcy case to ensure that the essential purposes of the discharge are not undermined.").

The District Court rejected INA's argument that the true nature of ACMC's declaratory judgment action was a federal defense to a state law contract claim because "[t]he scope and ramifications of the federal injunctions granted under Section 524(a) of the Bankruptcy Code, the Plan, and the Confirmation Order

16

are issues which are independent of the nature of INA's pre-confirmation claims." The District Court was correct. Although a discharge in bankruptcy can constitute an affirmative defense to a state law contract claim, ACMC's action to enforce the discharge injunction——and to construe the scope and effect of the confirmed reorganization plan——need not, *indeed cannot*,[14] resolve any state law contract issues, only whether INA's pre-confirmation claim, as stated, was discharged or otherwise barred by the Bankruptcy Court's confirmation of National Gypsum's reorganization plan. As such, the adversary proceeding is a federal cause of action, asserting a statutory right under the Bankruptcy Code, that does not depend improperly on the Declaratory Judgment Act as a basis for core bankruptcy jurisdiction.

The *Skelly Oil/Franchise Tax Board* line of decisions relied on by INA and this Court's *Fabrique* decision are not inconsistent with the Bankruptcy Court's finding of core bankruptcy jurisdiction. First, unlike the Federal Power Commission's "certificate of public convenience and necessity" at issue in *Skelly Oil*, 70 S.Ct. at 880-82, or the scope of ERISA preemption at issue in *Franchise Tax Board*, 103 S.Ct. at 2848-49, the section 524(a) discharge injunction is not solely a federal defense to potential state

---

[14] The declaratory judgment complaint filed by ACMC and the Trust addressed only bankruptcy issues, specifically the operation of the confirmed plan and the discharge injunctions. Before the Bankruptcy Court, the parties agreed that the issues raised by the complaint were exclusively matters of federal bankruptcy law. Similarly, at oral argument before this Court, counsel for INA acknowledged that the complaint did not raise any state law contract issues.

actions; instead, "[l]ike the automatic stay of section 362(a), the discharge injunction is the equivalent of a court order," 4 *Collier on Bankruptcy* ¶ 524.02[2], at 524-14. Second, unlike section 363(m)'s federal "copper-bottoming" of a state good faith purchaser defense at issue in *Fabrique*, a proceeding to enforce or construe a bankruptcy court's section 524(a) discharge injunction issued pursuant to its confirmation order—and whether the confirmed reorganization plan precludes certain post-confirmation collection efforts—necessarily arises under title 11 and supports a finding that federal jurisdiction exists under 28 U.S.C. § 1334 and that such a proceeding is "core" under 28 U.S.C. § 157(b).

Accordingly, we agree with both the Bankruptcy Court and the District Court and hold that a declaratory judgment action seeking merely a declaration that collection of an asserted pre-confirmation liability is barred by a bankruptcy court's confirmation of a debtor's reorganization plan (and the attendant discharge injunctions under sections 524 and 1141 of the Bankruptcy Code) is a core proceeding arising under title 11. *Wood*, 825 F.2d at 97; 28 U.S.C. § 157(b)(2)(B),(C), and (O).

## II.

INA argues that the Bankruptcy Court erred when it concluded that it had discretion to refuse to stay the adversary proceeding in favor of arbitration pursuant to the Wellington Agreement's arbitration provision.[15] Whether a bankruptcy court has discretion

---

[15] Paragraph VIII(6) of the Wellington Agreement provides:

"6. Subscribing Producers and Subscribing Insurers shall

18

to deny a motion to stay is a question of law which this Court reviews *de novo*. *In the Matter of Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 754 (5th Cir. 1993).

INA makes three arguments in support of its contention that the Bankruptcy Court erroneously denied its motion to stay pursuant to the Federal Arbitration Act. First, INA argues that the legal standard used by the Third Circuit in *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1161 (3d Cir. 1989), providing that a court "should enforce [an arbitration] clause unless that effect would seriously jeopardize the objectives of the Code," applies to the instant proceeding. Second, INA argues that the Bankruptcy Court improperly relied on considerations of efficiency as a basis for denying INA's motion to stay. Finally, INA argues that the District Court erroneously concluded that the Bankruptcy Court had discretion to determine whether issues should be submitted to arbitration under the Act. INA contends that cases holding that a bankruptcy court has discretion to deny arbitration of core bankruptcy matters are irreconcilable with the Supreme Court's non-discretionary standard set forth in *Shearson/American Express, Inc. v. McMahon*, 107 S.Ct. 2332 (1989) (holding claims under the Securities Exchange Act of 1934 and the federal RICO statute arbitrable and subject to the Act), and *Rodriguez de Quijas v. Shearson/American Express, Inc.*,

---

resolve through alternative dispute resolution, in the manner set forth in Appendix C hereto, any disputed issues within the scope of the Agreement and the Appendices hereto."

19

109 S.Ct. 1917 (1989) (holding claims under the Securities Act of 1933 arbitrable), and that whether a matter is "core" or "non-core" under 28 U.S.C. § 157 is irrelevant to mandatory arbitration under the Act.

ACMC and the Trust, on the other hand, contend that the arbitration clause in the Wellington Agreement does not trigger mandatory arbitration under the Federal Arbitration Act of its declaratory judgment action. First, they argue that arbitration and the objectives of the Bankruptcy Code conflict when core bankruptcy issues are involved. For example, ACMC and the Trust note that the Third Circuit in *Hays*, although finding pre-petition, non-core claims of the debtor arbitrable, found that the trustee's section 544(b) fraudulent conveyance claim was not subject to arbitration. Second, ACMC and the Trust argue that, even if the core/non-core distinction is not appropriate, mandatory arbitration of its section 524(a) claim would nevertheless conflict with Bankruptcy Code objectives by allowing arbitrators to determine discharge issues and to interpret bankruptcy court orders. Third, ACMC and the Trust make an argument that an interpretation of the Act that would permit arbitrators to determine whether INA violated the discharge injunction would violate the separation-of-powers doctrine because Congress would be "interfering with the [bankruptcy] court's ability to enforce its judgments." Finally, they contend that the Wellington Agreement's arbitration clause is not broad enough to cover their claims set forth in the complaint.

20

A. *The Standard for Enforcing an Applicable Arbitration Clause*

The parties disagree as to the standard a bankruptcy court should use to determine whether to order arbitration of a core bankruptcy issue. INA contends that, provided an arbitration clause is otherwise applicable, the bankruptcy court must order arbitration unless it would seriously jeopardize the objectives of the Bankruptcy Code. ACMC and the Trust contend that arbitration of core bankruptcy issues inherently present such a conflict.

Section 3 of the Federal Arbitration Act provides, in pertinent part, that a court "upon being satisfied that the issue involved . . . is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Addressing the arbitrability of federal RICO and securities fraud claims brought under the Securities Exchange Act of 1934 in *McMahon*, the Supreme Court stated:

> "The Arbitration Act, standing alone, therefore mandates enforcement of agreements to arbitrate statutory claims. Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command. The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue. If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent 'will be deducible from [the statute's] text or legislative history' or from an inherent conflict between arbitration and the statute's underlying purposes." *McMahon*, 107 S.Ct. at 2337-38.

Two years later, addressing the arbitrability of securities fraud claims brought under the Securities Act of 1933, the Supreme Court

21

again used the standard set forth in *McMahon* to find the claims arbitrable. *Rodriguez*, 109 S.Ct. at 1921 ("[T]he party opposing arbitration carries the burden of showing that Congress intended in a separate statute to preclude a waiver of judicial remedies, or that such a waiver of judicial remedies inherently conflicts with the underlying purposes of that other statute.") (overruling *Wilko v. Swan*, 74 S.Ct. 182 (1953)).

Citing the Supreme Court's increased recognition of the force of 9 U.S.C. § 3 in *McMahon* and *Rodriguez*, the Third Circuit, in *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, ordered the arbitration of a non-core bankruptcy adversary proceeding. In *Hays*, a Chapter 11 trustee brought a number of federal and state claims against Merrill Lynch concerning various securities transactions. Merrill Lynch filed a motion to dismiss the federal RICO and 1933 Act claims pursuant to an arbitration clause contained in the brokerage agreement. The district court refused to compel arbitration.[16] *Hays*, 885 F.2d at 1150-51.

The Third Circuit, reversing the district court, rejected the notion that the Bankruptcy Code impliedly modified the Act and stated that a Chapter 11 trustee is bound by an arbitration clause to the same extent as would be a debtor. *Id.* at 1155. The Third

---

[16] The district court premised its decision on *Zimmerman v. Continental Airlines*, 712 F.2d 55 (3d Cir. 1983), *cert. denied*, 104 S.Ct. 699 (1984). In *Zimmerman*, decided before both *McMahon* and the 1984 amendments to the Bankruptcy Code, the Third Circuit held that, "because the underlying purposes of the Bankruptcy Reform Act impliedly modify the Arbitration Act, the granting of a stay pending arbitration, even when the arbitration clause is contractual, is a matter left to the sound discretion of the bankruptcy judge." *Id.* at 56.

22

Circuit held that, as the "'trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor'" subject to defenses—such as a contractual arbitration provision—as could have been asserted by a defendant, the trustee was bound to arbitrate all causes of action derived from section 541.[17]  *Id.* at 1154.  Accordingly, the Third Circuit held that the federal RICO and securities fraud actions must be ordered arbitrated, but that the trustee's section 544(b) avoidance action—which was "not derivative of the bankrupt" but rather a "statutory cause[] of action" under the Bankruptcy Code for the benefit of the creditors—was not subject to the arbitration provision.  *Id.* at 1155.

The *Hays* opinion does go to some length to distinguish the arbitrable claims as "involv[ing] non-core proceedings" and highlighted the heightened role of nonbankruptcy court adjudication brought about by the 1984 amendments.  *Id.* at 1159.  In light of the "clear congressional rejection of judicial skepticism" concerning arbitration recognized in *McMahon* and *Rodriguez*, the Third Circuit concluded that an adversary proceeding involving debtor-derivative, non-core matters would not "seriously jeopardize the objectives of the Code."  *Id.* at 1160-61.

With respect to derivative, non-core matters, the Third Circuit's opinion in *Hays* makes eminent sense, particularly in light of the 1984 amendments to the Bankruptcy Code.  Indeed, in

---

[17]     11 U.S.C. § 541 defines the property included in the bankruptcy estate, which includes all legal and equitable interests of the debtor.

this regard it has been universally accepted. *See* Fred Neufeld, *Enforcement of Contractual Arbitration Agreements under the Bankruptcy Code*, 65 Am. Bankr. L.J. 525 (1991) (providing a circuit-by-circuit analysis); Mette H. Kurth, Comment, *An Unstoppable Mandate and an Immovable Policy: The Arbitration Act and the Bankruptcy Code Collide*, 43 U.C.L.A. 999 (1996) (same).

Whether a bankruptcy court has discretion to enforce an applicable arbitration clause where core bankruptcy issues are involved was not addressed specifically by *Hays*, although other courts have found the core/non-core distinction useful. *See, e.g.*, *Selcke v. New England Ins. Co.*, 995 F.2d 688, 691 (7th Cir. 1993) ("Even broadly worded arbitration clauses are assumed not to extend to claims that arise out of the provisions of the bankruptcy law itself . . . ."); *In re Spectrum Info. Techs., Inc.*, 183 B.R. 360, 363 (Bankr. E.D.N.Y. 1995) ("[E]specially with respect to core proceedings, . . . arbitration should not triumph over the specific jurisdiction bestowed upon the bankruptcy courts under the Bankruptcy Code.") (citing cases); *In re Sacred Heart Hosp.*, 181 B.R. 195, 202 (Bankr. E.D. Pa. 1995) ("[A]s to core proceedings, this court may exercise its full panoply of discretion . . . in determining whether to refer a proceeding before it to arbitration."); *In re American Freight Sys., Inc.*, 164 B.R. 341, 347 (D. Kan. 1994) ("The teachings of *Hays & Co.* are not applicable to an adversary proceeding involving a core matter."); *In re Glen Eagle Square, Inc.*, 1991 WL 71782 (Bankr. E.D. Pa. May 1, 1991) (holding that the court retained discretion to order arbitration of

core proceedings because "they impact upon the Debtor's relationship with its entire body of creditors"); *In re FRG*, 115 B.R. 72, 74-75 (E.D. Pa. 1990). *But see In re Barkman*, Inc., 170 B.R. 321, 323 n.1 (Bankr. E.D. Mich. 1994) ("For purposes of determining whether Congress intended to carve out an exception to § 3 of the Arbitration Act, the core/non-core distinction would seem to be of only indirect significance.").

ACMC and the Trust urge us to adopt a position that categorically finds arbitration of core bankruptcy proceedings inherently irreconcilable with the Bankruptcy Code. Cognizant of the Supreme Court's admonition that, in the absence of an inherent conflict with the purpose of another federal statute, the Federal Arbitration Act mandates enforcement of contractual arbitration provisions, *McMahon*, 107 S.Ct. at 2337-38, we refuse to find such an inherent conflict based solely on the jurisdictional nature of a bankruptcy proceeding. Rather, as did the Third Circuit in *Hays*, we believe that nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceeding, *i.e.*, whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes of the Code. In this regard, we agree with INA that the discretion enjoyed by a bankruptcy court to refuse enforcement of an otherwise applicable arbitration provision depends upon a finding that the

standard set forth in *McMahon* has been met.[18]  But because we believe that ACMC and the Trust's declaratory judgment complaint—which concerned matters central to National Gypsum's confirmed reorganization plan and implicated contractual issues in only the most peripheral manner (if at all)—met this standard, we conclude that the Bankruptcy Court was within its discretion to refuse to order arbitration of the adversary proceeding (which was limited to the effect, if any, of National Gypsum's confirmed reorganization plan and attendant injunctions on INA's collection efforts).[19]

The core/non-core distinction conflates the inquiry set forth in *McMahon* and *Rodriguez* with the mere identification of the jurisdictional basis of a particular bankruptcy proceeding. Certainly not all core bankruptcy proceedings are premised on provisions of the Code that "inherently conflict" with the Federal Arbitration Act; nor would arbitration of such proceedings necessarily jeopardize the objectives of the Bankruptcy Code. Although, as appellees suggest, "the core/non-core distinction is

---

[18]     We disagree, however, with the narrowness of the example offered by INA at oral argument of the type of arbitration that would be "irreconcilable" with the purpose of the Bankruptcy Code: a situation where a creditor and a debtor agreed pre-bankruptcy to arbitrate the actual amount the creditor *would be paid on a claim* under the contract in the event of bankruptcy (effectively contracting out of a bankruptcy court's power to adjust claims among different classes of creditors).  Such a contractual provision—essentially an *ipso facto* clause—would plainly be unenforceable without regard to any conflict, real or apparent, with the Federal Arbitration Act.  *Cf.* 11 U.S.C. §§ 363(*l*); 365(f)(1); 541(c).

[19]     We note that at the time the instant complaint was filed, arbitration had not even been set in motion.

a practical and workable one," it is nonetheless too broad. The "discretion" that ACMC and the Trust urge should exist only where a particular bankruptcy proceeding meets the standard for nonenforcement of an arbitration clause set forth in *McMahon* and *Rodriguez*. *See In re Chorus Data Sys.*, 122 B.R. 845, 851 (Bankr. N.H. 1990) ("[U]nder the Supreme Court precedents there is discretion but in the bankruptcy context there must be a demonstrated specific conflict between enforcing an arbitration clause and the textual provisions and/or purposes of the Bankruptcy Code to justify the exercise of discretion by a bankruptcy court in refusing to enforce an arbitration clause.") It is doubtful that "core" proceedings, categorically, meet the standard.

In the most common type of creditor-initiated core proceeding—a motion for relief from the automatic stay[20]—bankruptcy courts regularly have permitted arbitration to continue (or commence) in spite of the presence of core bankruptcy jurisdiction. In those cases permitting arbitration, courts have typically found little difficulty with arbitration of disputes where resolution would not involve matters of federal bankruptcy law.

For example, in *In re Statewide Realty Co.*, 159 B.R. 719, 722 (Bankr. D. N.J. 1993), the debtor had objected to claims advanced by Hilton International under a rejected management agreement, and Hilton sought relief from the automatic stay to resolve the claim

---

[20]    11 U.S.C. § 362(d) allows a bankruptcy court to grant relief from the § 362(a) automatic stay when a creditor establishes "cause."

27

pursuant to an arbitration provision in the agreement. Acknowledging that its discretion to deny enforcement of an otherwise applicable arbitration provision rested on a finding that arbitration would conflict with the provisions or purpose of the Bankruptcy Code, the bankruptcy court rejected a reading of *Hays* now advanced by ACMC and the Trust:

> "The fact that the matter before the court is a core proceeding does not mean that arbitration is inappropriate. The description of a matter as a core proceeding simply means that the bankruptcy court has the jurisdiction to make a full adjudication. However, merely because the court has the authority to render a decision does not mean it should do so. The discussion in *Hays* regarding core and non-core proceedings is not read by this court as suggesting that core proceedings may not be subject to arbitration. Rather it appears that the *Hays* court sought to distinguish between actions derived from the debtor, and therefore subject to the arbitration agreement, and bankruptcy actions in essence created by the Bankruptcy Code for the benefit ultimately of creditors of the estate, and therefore not encompassed by the arbitration agreement." *Id.* at 724.

The court went on to note that, although "a significant portion of [Hilton's] claim stems from damages that result from the Debtor's rejection of the Management Agreement pursuant to Bankruptcy Code § 365, the bankruptcy issues as to whether rejection of the Management Agreement was a proper exercise of the Debtor's business judgment already have been determined in the hearings conducted by the court." *Id.* With only state contract issues concerning the agreement left to resolve, the bankruptcy court was unable to discern a conflict with the Bankruptcy Code posed by arbitration. *Id.; see also In re Chorus Data Systems, Inc.*, 122 B.R. 845 (Bankr. D. N.H. 1990) (granting relief from the automatic stay to arbitrate an unliquidated product development agreement claim and

28

counterclaim where the Chapter 11 debtor's reorganization plan was not wholly contingent on the outcome and resolution involved only state law contract issues); *In re Bicoastal Corp.*, 111 B.R. 999 (Bankr. M.D. Fla. 1990) (granting relief from the automatic stay to arbitrate an unliquidated claim arising from a stock purchase price adjustment dispute involving exclusively contract issues and application of generally accepted accounting principles).

We find the *Statewide* bankruptcy court's reading of *Hays* persuasive. Indeed, distinguishing between those actions derived from the debtor and those created by the Bankruptcy Code explains the consistent reluctance to permit arbitration of actions brought to adjudicate *bankruptcy rights*. There can be little dispute that where a core proceeding involves adjudication of federal bankruptcy rights wholly divorced from inherited contractual claims, the importance of the federal bankruptcy forum provided by the Code is at its zenith. Arguably, these actions are simply beyond the coverage of most, if not all, arbitration provisions. But, assuming an otherwise applicable arbitration provision, the adjudication of these actions outside the federal bankruptcy forum could in many instances present the type of conflict with the purpose and provisions of the Bankruptcy Code alluded to in *McMahon*. *See Hays*, 885 F.2d at 1155 ("Claims asserted by the trustee under section 544(b) are not derivative of the bankrupt. They are creditor claims that the Code authorizes the trustee to asset on their behalf."); *In re Barney's Inc.*, 206 B.R. 336 (Bankr. S.D.N.Y. 1997) (finding Chapter 11 debtor's section 544(a)

29

avoidance action, section 549 avoidance action, and section 542 turnover action were not subject to arbitration); *In re Dunes Hotel Associates*, 194 B.R. 967, 992 (Bankr. D.S.C. 1996) (finding Chapter 11 debtor's section 544(a) avoidance action, section 542 turnover action, and section 365 rejection action were not subject to arbitration); *In re Arentson*, 126 B.R. 236, 238 (Bankr. N.D. Miss. 1991) (refusing to order arbitration of a wrongful termination action brought by a Chapter 7 debtor under section 525(b), which provides redress for discrimination against an individual because of a bankruptcy filing, because it was a cause of action "exclusively related to a bankruptcy statute . . . that literally begs for resolution in a bankruptcy forum"); *cf. In re Pate*, 198 B.R. 841, 846 (Bankr. S.D. Ga. 1996) (finding Chapter 13 debtor's Federal Truth in Lending Act claim involving the financing of a mobile home, which was core under 28 U.S.C. § 157(b)(2)(C) (counterclaims by the debtor's estate), was arbitrable).

We think that, at least where the cause of action at issue is not derivative of the pre-petition legal or equitable rights possessed by a debtor but rather is derived entirely from the federal rights conferred by the Bankruptcy Code, a bankruptcy court retains significant discretion to assess whether arbitration would be consistent with the purpose of the Code, including the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation,and the undisputed power of a bankruptcy court to enforce its own orders.

B.   *The Bankruptcy Court's Decision Not To Order Arbitration*

We turn now to whether the Bankruptcy Court's decision not to stay the adversary proceeding was an abuse of discretion.[21]   As discussed above, the Bankruptcy Court possessed discretion to refuse to enforce an otherwise applicable arbitration provision[22]

---

[21]     INA contends that the Bankruptcy Court improperly relied on efficiency concerns to refuse enforcement of the Wellington Agreement's arbitration provision.  The Supreme Court has stated that efficiency concerns are not an appropriate defense to an otherwise applicable arbitration clause. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 103 S.Ct. 927, 939 (1983); *Tai Ping Ins. Co., Ltd. v. M/V Warschau*, 731 F.2d 1141, 1146 (5th Cir. 1984) ("To the extent that [a party contesting enforcement of an applicable arbitration clause] relies on premises of economy of effort, moreover, *Moses Cone* indicates that this reliance is misplaced."). In the bankruptcy context, however, efficient resolution of claims and conservation of the bankruptcy estate assets are integral purposes of the Bankruptcy Code.  Accordingly, insofar as efficiency concerns might present a genuine conflict between the Federal Arbitration Act and the Code——for example where substantial arbitration costs or severe delays would prejudice the rights of creditors or the ability of a debtor to reorganize——they may well represent legitimate considerations. *Cf. In re Day*, 208 B.R. 358, 370 (Bankr. E.D. Pa. 1997) (refusing to order arbitration of claims allowance issues where confirmation of the debtors' Chapter 13 plans was dependent upon immediate resolution of objections to creditors' claims).  Here, the Bankruptcy Court noted that the arbitration "process has not yet commenced" (indeed, when the complaint was filed arbitration had not been requested) and that "this court constitutes the most efficient and effective forum in which to determine the core Bankruptcy Code issues" (and the court went on to recite the several factors set out in *In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 6 F.3d 1184, 1189 (7th Cir. 1993)).  The Bankruptcy Court was not so much saying that efficiency concerns would of themselves authorize denial of the stay as it was suggesting that had the arbitration process actually been well advanced it might have been more inclined to grant the stay.  INA's argument in this respect presents no reversible error.

[22]     ACMC and the Trust contend that their declaratory judgment action was not within the scope of the Wellington Agreement's arbitration provision, *supra* note 15, and that the stay provision of the Federal Arbitration Act is therefore not applicable. Neither the Bankruptcy Court nor the District Court explicitly addressed the issue, apparently assuming the applicability of the arbitration provision and finding that enforcement was nevertheless

only insofar as enforcement would conflict with the purpose or provisions of the Bankruptcy Code.

The declaratory judgment action brought by ACMC and the Trust sought a declaration that the section 524(a) discharge injunction barred INA's collection efforts, or that the terms and provisions of the reorganization plan or the Bankruptcy Court's confirmation order precluded collection of INA's claim for prepetition debts allegedly owing under the Wellington Agreement.  As stated, the complaint raised no issues under the Wellington Agreement and was restricted entirely to the adjudication of federal bankruptcy issues.  The complaint asked, in fine, for the Bankruptcy Court to construe its own order.  Nothing in the complaint permitted the Bankruptcy Court to address the merits of INA's claim under the Wellington Agreement or ACMC and the Trust's contract or equitable defenses to INA's claim under state law.  In short, if appellees were successful, and the Bankruptcy Court determined that INA's collection efforts were barred either by the section 524(a) discharge injunction or by the terms of the confirmed reorganization plan, INA's collection efforts would be barred under bankruptcy law.[23]  If appellees were unsuccessful, resolution of the

within the court's discretion.  Although we find the applicability of the arbitration provision to this action subject to considerable doubt, *see United Offshore Co. v. Southern Deepwater Pipeline*, 899 F.2d 405, 409-10 (5th Cir. 1990), we also assume its applicability for the purposes of this appeal.

[23]     INA argues that its collection efforts do not implicate the section 524(a) discharge injunction because the pre-confirmation debt it alleges stems from an assumed contract under section 365. The Bankruptcy Court, in a bench ruling on March 28, 1997, modifying its earlier October 22, 1996, order, essentially agreed.

merits of INA's claim under the Wellington Agreement would remain

open, presumably subject to any valid arbitration provision.[24]

---

The Bankruptcy Court ruled that the Chapter 11 discharge provision, section 1141(d)(1), does not address claims based on the *assumption* of an executory agreement because section 365(b)(1) requires the debtor to cure any default as a prerequisite to assumption. Accordingly, the Bankruptcy Court ruled that section 1141(d)(1) addresses only claims based on the *rejection* of an executory contract (by referring to section 502(g)). The Bankruptcy Court stated that, as to amounts allegedly owed under an assumed executory contract, the assumption order governs (which, in this case, was incorporated in the relevant provisions of the reorganization plan and the confirmation order). Observing that section 1141(d)(1) cannot be read to provide for discharge of amounts in default under assumed executory contracts without nullifying the cure requirement of section 365(b)(1), the Bankruptcy Court held that its *adjudication* of the plan——rather than the discharge injunction provided by section 1141(d)(1) and section 524(a)——precluded INA's collection efforts. *See Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987).

Whether viewed as a question of the coverage of the discharge injunction or as an issue concerning prior adjudication, it is plain, however, that resolution of ACMC and the Trust's declaratory judgment action implicated issues arising exclusively from National Gypsum's rights conferred by its confirmed reorganization plan. As stated, INA's argument relates to whether the Bankruptcy Court should have granted the relief sought by ACMC and the trust, not whether it should have ordered arbitration. Although we express no opinion as to the correctness of the Bankruptcy Court's determination, we are quite certain that it was the proper *forum* to address the limited issues raised in the complaint.

[24]     INA cited *Picco v. Global Marine Drilling Co.*, 900 F.2d 846 (5th Cir. 1990), at oral argument for the proposition that it is appropriate for other courts——and therefore arbitrators——to interpret the preclusive effect of bankruptcy court orders.

*Picco*, however, may not be read so broadly as to always preclude bankruptcy court refusal to defer to a prospective, nonbankruptcy, nonjudicial forum to entertain an action limited *solely* to the scope of a bankruptcy court's order. Picco involved a Canadian personal-injury claimant (Picco) whose suit against a Chapter 11 debtor was dismissed without prejudice on *forum non conveniens* grounds during the pendency of the automatic stay. Picco did not appeal the dismissal. After the bankruptcy court lifted the automatic stay to permit personal-injury actions to proceed, however, he refiled his claim in Canada. Later still, he decided that Texas state court was a preferable forum, but the statute of limitations had expired on his action. Picco therefore moved the district court to set aside its prior judgment and re-

We are convinced that arbitration of a core bankruptcy adversary proceeding brought to determine whether INA's collection efforts were barred by the section 524(a) discharge injunction or by the confirmation of National Gypsum's reorganization plan, as a nondebtor-derivative action to enforce asserted rights created by the Bankruptcy Code that are completely divorced from National Gypsum's prepetition rights under the Welllington Agreement, would be inconsistent with the Bankruptcy Code. Whether premised, as the District Court suggested, on a finding that enforcement of the arbitration provision would irreconcilably conflict with the Bankruptcy Code,[25] *McMahon*, 107 S.Ct. 2332, or on the view that

dismiss with conditions permitting him to refile in Texas state court. The district court granted his motion. At issue in the appeal was whether Picco——who chose not to appeal the initial dismissal by the district court——could challenge jurisdiction to enter the initial dismissal in a subsequent Rule 60(b)(4) proceeding. This Court concluded that, as Picco had had the opportunity to challenge the district court's jurisdiction on appeal from the initial dismissal, he was barred from challenging it in the context of a Rule 60(b) proceeding.

Our unremarkable statement in *Picco* that "district courts retain jurisdiction to determine the applicability of the [§ 362(a) automatic] stay to litigation pending before them, and to enter orders not inconsistent with the terms of the stay," *Picco*, 900 F.2d at 850, did not, of course, foreclose a debtor's ability to redress violations of the automatic stay through contempt proceedings in the bankruptcy court, nor was it intended to diminish the ability of a bankruptcy court to entertain actions to enforce or construe the effects of its own orders. *Cf. Celotex Corporation v. Edwards*, 115 S.Ct. 1493 (1995) (where bankruptcy court has jurisdiction to issue stay order, validity of that order may not be collaterally attacked).

[25]    The District Court noted that, although the Bankruptcy Court "did not expressly analyze whether referring the core issues in the Complaint would seriously jeopardize the underlying policies of the Bankruptcy Code," arbitration nevertheless would present a conflict with the Code because it would "allow a panel of arbitrators to decide whether and how to enforce the federal injunctions granted under 11 U.S.C. Section 524(a) and how to apply the Plan and the

34

bankruptcy courts have discretion to deny enforcement of arbitration clauses in core cases when the only rights at issue were created by the Bankruptcy Code rather than inherited from a debtor's pre-petition property, *Hays*, 885 F.2d at 1155, the Bankruptcy Court was within its discretion to deny INA's motion to stay under the Federal Arbitration Act.[26] Accordingly, the judgment of the District Court, affirming the order of the Bankruptcy Court, is

AFFIRMED.

---

Confirmation Order to these alleged pre-petition debts."

[26] Accordingly, we have no need to address ACMC and the Trust's substantially more questionable argument that arbitration would run afoul of the separation-of-powers principles set forth in *Plaut v. Spendthrift Farm, Inc.*, 115 S.Ct. 1447 (1995).