# In re HYDRO–ACTION, INC., Debtor.

### Hydro–Action, Inc., Plaintiff,

### v.

### Bruce A. Craig, Julie Craig, Larry K. Jernigan, Lisa E. Jernigan, and Latrelle Mouton, Defendants.

Bankruptcy No. 01–10209.
Adversary No. 01–1030.

United States Bankruptcy Court,
E.D. Texas,
Beaumont Division.

Aug. 31, 2001.

Michael E. Gazette, Tyler, TX, for Bruce A. Craig, Julie Craig & LaTrelle Mouton.

Michael J. Lindsay, Beaumont, TX, for Larry K. & Lisa E. Jernigan.

Frank J. Maida, Tagnia Fontana, Maida Law Firm, P.C., Beaumont, TX, for Hydro-Action, Inc.

### MEMORANDUM OF DECISION

BILL PARKER, Bankruptcy Judge.

Before the Court for consideration are three "Motions to Compel Arbitration" filed by three of the respective Defendants, Bruce A. Craig, Julie Craig (referenced jointly as the "Craig Defendants") and LaTrelle Mouton, in the above-refer-

enced adversary proceeding.[1] The Court conducted a hearing on the motion on August 21, 2001. At the conclusion of the hearing, the Court took the matter under advisement to review the authorities relied upon by each party. This memorandum of decision disposes of all issues pending before the Court.[2]

### Factual And Procedural Background

The facts germane to the determination of these motions are not in serious dispute. In 1998, Gig Drewery was the president and majority shareholder of three corporations involved in the business of wastewater treatment, one of which was the current Debtor and Debtor–in–Possession, Hydro–Action, Inc. At that time, Drewery reached an agreement with Bruce Craig whereby Craig agreed to contribute his management, financial and administrative expertise to these three businesses and would thereby be entitled to obtain an ownership interest in the businesses from Drewery. On January 19, 1998, Drewery and Craig, along with their respective spouses, Trina Drewery and Julie Craig, executed a "Master Transaction Agreement" (the "MTA") which set forth the agreement of the parties.[3] Included in the agreement was the following provision:

18. Resolution of Disputes. Gig and Bruce will mutually cooperate with each other in good faith in an attempt to resolve any disputes between them and to resolve any issue on which they are "deadlocked" and split on their vote. In the event they remain unable to resolve any such dispute or issue, then they agree to participate in good faith in mediation proceedings to be conducted in Jefferson or Hardin County, Texas, before an independent mediator mutually acceptable to Gig and Bruce. The cost of the mediation shall be shared equally by Gig and Bruce. If after mediation they still are deadlocked or unable to resolve the dispute, then they agree to participate in binding arbitration proceedings, to be conducted in Jefferson or Hardin County, Texas. Gig and Bruce shall each select one arbitrator, and the two arbitrators shall select a third arbitrator. Each of the arbitrators chosen shall be impartial and independent of all parties involved in the dispute or deadlock. The three arbitrators shall then proceed to arbitrate the dispute between Gig and Bruce. The arbitration shall be conducted in accordance with the rules of the American Arbitration Association. The three arbitrators shall hear and decide upon the resolution of the dispute by majority vote. The decision of the arbitrators shall be final and binding. Gig and Bruce shall each be entitled to have legal counsel to represent them in the arbitration proceeding. The charges and expenses of the arbitrators shall be shared equally by Gig and Bruce. The arbitration shall be conducted to preserve its privacy and confidentiality. Alternatively, in order to resolve any deadlock in vote between Gig and Bruce, they may mutually agree that such

---

1. Though not initially listed as movants in the motions, the remaining two Defendants, Larry K. and Lisa Jernigan, joined their fellow Defendants in the request for arbitration at the hearing. Such joinder will be permitted since it will cause no prejudice to the respondents due to the fact that the rights of Mr. and Ms. Jernigan are governed by the same employment agreement already put into issue by Ms. Mouton.

2. This Court has jurisdiction to consider the Motions pursuant to 28 U.S.C. §§ 1334, § 157(a), and 157(c)(1).

3. The MTA was executed by the four persons in their respective individual capacities and there was no formal execution of the agreement on behalf of any of the three referenced corporations.

deadlock may be resolved by referring the matter to Brian and Kelly Birch for a tie-breaker vote.

Following the execution of the MTA and the initiation of Bruce Craig's involvement with Hydro–Action, the remaining Defendants in this action, Larry K. Jernigan, Lisa Jernigan and LaTrelle Mouton, were each employed by Hydro–Action in 1998. Each of these Defendants executed a "Confidentiality, Non–Disclosure, and No Competition Agreement" (the "Employee Agreements") in conjunction with his or her employment by Hydro–Action, Inc. and its sister corporation, Aqua Drip Innovations, Inc. Each of these three Employee Agreements contained the following provision:

> 9. **ARBITRATION:** All claims, disputes, controversies and differences of every kind and nature, including questions of law and fact, which may arise between the parties hereto relating to or in any manner connected with any provision of this Agreement or the performance or breach thereof shall be arbitrated in Kountze, Texas. Furthermore, if there is a breach of this contract by the Signatory and the Manufacturer elects to turn it over to an Attorney or Arbitrator, then the Signatory will be responsible for all reasonable Attorneys Fees, arbitration or court costs.

All of these Defendants were employed by Hydro–Action at the time that it filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 2, 2001. Mr. Craig was serving as its president and chief executive officer at that time. Approximately two months later, in April, 2001, all of the Defendants were terminated from their respective positions with the Debtor corporation.

Subsequently, on June 14, 2001, the Debtor initiated this adversary proceeding, alleging that each of the Defendants were engaged in continuous violations of various covenants of their respective employment agreements with Hydro–Action designed to protect the trade secrets, customer lists, proprietary processes, and other valuable assets of the Debtor corporation. The Plaintiffs further seek a revocation of the purported release of the Jernigans from their employment agreements in March, 2001.[4] The Defendants have now answered and, other than activity based upon the Plaintiff–Debtor's request for injunctive relief which has now been withdrawn, little case administration has occurred in this adversary proceeding.

The Defendants through their motions seek to compel the arbitration of this dispute pursuant to the arbitration provisions in the MTA and the Employee Agreements, respectively. Though the Debtor corporation was not an actual signatory to the MTA, the Craig Defendants essentially assert that Hydro–Action should be bound by its terms since it was a third-party beneficiary to the MTA as recognized by the fact that the Debtor is seeking to enforce such an agreement against the Craigs in this proceeding. The Employee Agreements involving the Jernigans and Ms. Mouton were actually executed by Hydro–Action and those Defendants seek to enforce the arbitration provision contained in those Employee Agreements. The objection to such requests by the Debtor corporation is primarily based upon its assertion that this adversary proceeding is a core proceeding before this Court, an allegation which is disputed by the Defendants, and that this Court's interest in exercising its core jurisdiction supersedes any pre-petition contractual provision man-

---

**4.** A corresponding proceeding has been filed by Drewery in his individual capacity against these same defendants in the 58th Judicial District Court of Jefferson County, Texas.

dating arbitration. The Debtor corporation further asserts that its complaint primarily seeks permanent injunctive relief and that the arbitration process is not equipped to resolve such equitable disputes.

### Discussion

Contractual agreements to arbitrate disputes and the enforcement of such contractual provisions has prompted considerable jurisprudence in recent years. The passage of the Federal Arbitration Act ("FAA") and the recognition that the FAA "applies to all suits in state or federal court when the dispute concerns a contract evidencing a transaction involving commerce," *Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 269–70 (Tex.1992), *In re Valle Redondo, S.A.*, 47 S.W.3d 655, 661 (Tex.

App.—Corpus Christi 2001, orig. proceeding),[5] has triggered a number of cases describing the appropriate circumstances under which a court, whether state or federal, should yield to an alternative means of dispute resolution based upon the contractual agreement of the involved parties, notwithstanding the fact that the jurisdiction and judicial power of that court has been properly invoked.

█ In deciding whether a court is compelled to submit a contractual dispute to arbitration, one must first acknowledge the existence of a strong federal policy favoring the arbitration process which is embodied in the text of the FAA[6] and which is increasingly enforced in the jurisprudence in this area.[7]

**5.** A written arbitration provision in a contract evidencing a transaction involving commerce extends to any contract affecting commerce, as far as the Commerce Clause of the United States Constitution will reach. *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 268, 115 S.Ct. 834, 836, 130 L.Ed.2d 753 (1995). The issue is not whether the parties' dispute affects interstate commerce, but whether their dispute concerns a transaction that affects interstate commerce. *Anglin*, 842 S.W.2d at 272. The FAA does not require a substantial effect on interstate commerce; rather, it requires only that commerce be involved or affected. *In re L & L Kempwood Associates, L.P.*, 9 S.W.3d 125, 127 (Tex.1999). The parties herein have not disputed that the various issues of proprietary misconduct raised by the Plaintiff's Complaint involve commerce to a degree sufficient to place this issue under the auspices of the FAA. The Court would note, however, that the terms of these arbitration agreements could also be enforced under the provisions of the Texas General Arbitration Act, Tex. Civ. Prac. & Rem.Code §§ 171.001 et. seq., since neither agreement fits within any of the exclusions therefrom. Tex. Civ. Prac. & Rem.Code Ann. §§ 171.002. (West.Supp.2001).

**6.** The FAA provides that:
A written provision in...a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction,

or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
9 U.S.C.A. § 2 (West 1999)
If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.
9 U.S.C.A. § 3 (West 1999).

**7.** *See, e.g. Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 89, 121 S.Ct. 513, 521, 148 L.Ed.2d 373 (2000)[recognizing that the purpose of the FAA is "to reverse the longstanding judicial hostility to arbitration agreements ... and to place arbitration agreements upon the same footing as other contracts," *citing Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647,

The United States Supreme Court has in a series of decisions recognized four basic principles which serve as the initial guideposts regarding the arbitrability of disputes in the federal courts. First, federal courts recognize that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *AT & T Techs., Inc. v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). Secondly, in the absence of clear and unmistakable language to the contrary, the arbitrability of a dispute is a question of law for the Court to decide. Third, any decision regarding the arbitrability of a dispute is to be made without reference to the potential merits of the underlying claims. Finally, a presumption of arbitrability exists; however, an express provision excluding a particular type of dispute from arbitration will overcome the presumption and be enforced.[8]

Thus, as a threshold matter, a court must determine whether the particular dispute presented is subject to arbitration. This involves two specific determinations: (1) whether a valid, enforceable arbitration agreement exists, and (2) if so, whether the claims asserted fall within the scope of the agreement.[9] These determinations are generally based upon state law,[10] but the court must give due regard to the federal and state policies favoring arbitration and construe any ambiguities in favor of arbitration.[11] Obviously each of the two agreements invoked in this dispute must meet this test for the affected Defendant Movants to prevail.

As for the construction of each of the Employee Agreements [the "Confidentiality, Non–Disclosure, and No Competition Agreement"] executed by and between the Debtor, Hydro–Action, Inc. and Defendants, Larry K. Jernigan, Lisa Jernigan and LaTrelle Mouton, respectively, the determination regarding the arbitrability of the dispute is relatively straightforward and must be answered in the affirmative. Each of those documents evidence and memorialize a specific agreement between the Debtor corporation and the affected employee regarding his or her knowledge, activities, and conduct. Each agreement specifies that arbitration *shall* be used to resolve disputes. ¶ 9 of the Employee

---

1651, 114 L.Ed.2d 26 (1991) ]; *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, at p. 753, 44 Tex. Sup.Ct. J. 900 (Tex.2001) ["Because federal and state policies continue to favor arbitration, a presumption exists favoring agreements to arbitrate under the FAA."].

**8.** *See also, Smith Barney Shearson, Inc. v. Boone,* 47 F.3d 750, 752 (5th Cir.1995); *PaineWebber, Inc. v. Hofmann,* 984 F.2d 1372, 1376–77 (3d Cir.1993).

**9.** *See, e.g., Webb v. Investacorp, Inc.,* 89 F.3d 252, 257–58 (5th Cir.1996); *Prevot v. Phillips Petroleum Co.,* 133 F.Supp.2d 937, 939 (S.D.Tex.2001); *In re Copeland,* 45 S.W.3d 348, 349 (Tex.App.—Texarkana 2001, orig. proceeding).

**10.** *Id.* at 350.

**11.** *See, e.g., Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 475–76, 109 S.Ct. 1248, 1253–54, 103 L.Ed.2d 488 (1989); *General Motors Corp. v. Pamela Equities Corp.,* 146 F.3d 242, 251 (5th Cir.1998) ["The weight of this presumption is heavy: arbitration should not be denied unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation that could cover the dispute at issue." (internal quotations and citations omitted) ]. The same presumption is followed by Texas courts. *See, e.g., FirstMerit Bank, N.A.,* 52 S.W.3d 749, at 753 (Tex.2001) *Cantella & Co., Inc. v. Goodwin,* 924 S.W.2d 943, 944 (Tex.1996); *Ikon Office Solutions, Inc. v. Eifert,* 2 S.W.3d 688, 693 (Tex.App.—Houston [14th Dist.] 1999, no pet.).

Agreement is unambiguous and comprehensive in scope. It subjects *"all* claims, disputes, controversies and differences of *every* kind and nature . . . which may arise between the parties hereto relating to or in *any* manner connected with *any* provisions of this Agreement or the performance or breach thereof . . ." to arbitration (emphasis added).[12] Notwithstanding the proclivities of a recent Chief Executive to the contrary, the meanings of these three comprehensive words are not subject to serious dispute. "All" means all. "Every" means every. "Any" means any. Accordingly, the Court concludes that each of the similar disputes between Hydro–Action and the respective Defendants, Larry K. Jernigan, Lisa Jernigan and LaTrelle Mouton, are subject to the presumption of mandatory arbitration unless, as the Debtor corporation contends, there are sufficient grounds to override such a presumption.

■ The determination of whether the Debtor's disputes with Bruce and Julie Craig are subject to mandatory contractual arbitration is more complicated. At first glance, it appears doubtful that an enforceable arbitration agreement exists between Hydro–Action and the Craig Defendants since there is no dispute that the "Master Transaction Agreement" was executed solely by the Drewerys and the Craigs in their respective individual capacities and that Hydro–Action was not a formal party to the MTA. However, the Craig Defendants assert that the Debtor's reliance upon the various protective provisions of the MTA as the foundation for bringing its complaint against them demonstrates that Hydro–Action was a third-party beneficiary of the MTA and that the Debtor should therefore be bound by the arbitration provision contained therein.[13] At the hearing, the Debtor argued that the numerous references to the MTA in the Debtor's complaint were included "by mistake" and that such issues should only be germane to the pending state court action.

■ The jurisprudence is clear that, in limited circumstances, one who is not a signatory or direct party to a contract containing an arbitration clause, but whose position or conduct vis-a-vis that contract or one of the parties thereto is such that one may be deemed a third party beneficiary of the contract or otherwise held to be bound by the terms thereof through state law principles of contract and agency law, may be compelled to arbitrate a dispute arising out of or relating to the contract.[14] Included among such principles are: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.[15] However, because the arbitrability of disputes is strictly a matter of contract, the extension of the obligation to arbitrate is narrowly construed.

Although there is a general presumption against them, third party beneficiary contracts have, in fact, been recognized by Texas courts when it can be shown that the contracting parties intended to secure some benefit for the third party. As the Supreme Court of Texas has stated:

12. See *supra,* page 642, for a complete text.

13. See *supra,* pp. 641–42 for the arbitration provision in the Master Transaction Agreement.

14. *See, e.g., Employers Ins. of Wausau v. Bright Metal Specialties, Inc.,* 251 F.3d 1316, 1322 (11th Cir.2001); *International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 416–17 (4th Cir.2000); *Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration International, Inc.,* 198 F.3d 88, 97 (2d Cir.1999).

15. *Id.*

To qualify as one for whose benefit the contract was made, the third party must show that he is either a donee or creditor beneficiary of, and not one who is benefited (sic) only incidentally by the performance of, the contract. One is a donee beneficiary if the performance promised will, when rendered, come to him as a pure donation. If, on the other hand, that performance will come to him in satisfaction of a legal duty owed to him by the promisee, he is a creditor beneficiary.... [T]his duty may be an indebtedness, contractual obligation or other legally enforceable commitment owed to the third party.... The intention to contract or confer a benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied. Consequently, a presumption exists that parties contracted for themselves unless it "clearly appears" that they intended a third party to benefit from the contract.

*MCI Telecommunications Corp. v. Texas Utilities Elec. Co.*, 995 S.W.2d 647, 651 (Tex.1999) (citations omitted).

There is little doubt that Hydro–Action is asserting itself as a third party beneficiary of the MTA in this case. Its complaint is primarily based upon its ability to enforce the terms of the MTA against the Craigs. ¶ 8 of the complaint alleges that the Craigs owe fiduciary duties to the Hydro–Action arising from the execution of the MTA, "whereby the Craigs agreed to keep confidential and not disclose, reveal or use any of the knowledge obtained or trade secrets, customer lists, proprietary processes used by Hydro–Action." ¶ 11 of the complaint alleges that the Craigs' alleged post-dismissal employment activities "violates the Master Transaction Agreement and could potentially cause substantial harm to Hydro–Action." In ¶ 12 of the complaint, Hydro–Action further complains that "... such conduct by Bruce and Julie Craig is in violation of the Master Transaction Agreement and causes harm to Hydro–Action by reducing the value of the company and threatening property of the Bankruptcy estate." ¶ 13 complains that "[I]n blatant violation of the Master Transaction Agreement, Bruce and Julie Craig have conspired with the other Defendants to appropriate to themselves Hydro–Action's confidential matters...." Finally, ¶ 14 of the Debtor's complaint asserts that "Craig, through misappropriation, is using the dealer lists and computer software of Hydro–Action, in direct competition with Hydro–Action, thereby causing damage to the company in its reorganization process." The primary means through which the Debtor can claim a misappropriation by the Craigs is through the protections offered by the Master Transaction Agreement.

Without addressing the actual merits of the complaint, it is clear that Hydro–Action is within its rights to attempt to seek enforcement of the covenants of the MTA. The MTA specifically references Hydro–Action, Inc. as one of the businesses for which the business expertise of Bruce and Julie Craig is sought. Under ¶ 7 of the MTA, Bruce Craig is specifically employed as a full time employee of Hydro–Action and two of his existing employees are hired as employees of Hydro–Action under ¶ 13. Thus, it clearly appears that Hydro–Action is a third party creditor beneficiary of the MTA between the Drewerys and the Craigs.

The Craigs, therefore, assert that the arbitration provision should be enforced against Hydro–Action since the Debtor is a third party beneficiary of the MTA. This presents an unusual circumstance since, in most of the arbitration jurisprudence reviewed by the Court, arbitration under a third party beneficiary theory is usually

advocated by the third party who is seeking to enforce an arbitration agreement. Here, however, it is the signatory who is seeking to enforce the arbitration provisions against a non-signatory beneficiary. Under these circumstances, the obligation to arbitrate is more precisely characterized as one of estoppel. As expressed by the Seventh Circuit in *Hughes Masonry Co., Inc. v. Greater Clark County School Bldg. Corp.*, 659 F.2d 836 (7th Cir.1981):

> Hughes now argues, however, that it cannot be required to arbitrate because [the Defendant] is not entitled to invoke the arbitration provision of the Hughes–Clark agreement since it is not a party to that agreement. Whatever the merit of this argument, we believe that Hughes [the Plaintiff] is equitably estopped from asserting it in this case, because the very basis of Hughes' claim against J.A. [the Defendant] is that J.A. breached the duties and responsibilities assigned and ascribed to J.A. by the agreement between Clark and Hughes.... In substance, however, Hughes is attempting to hold J.A. to the terms of the Hughes–Clark agreement. Hughes' complaint is thus fundamentally grounded in J.A.'s alleged breach of the obligations assigned to it in the Hughes–Clark agreement. Therefore, we believe it would be manifestly inequitable to permit Hughes to both claim that J.A. is liable to Hughes for its failure to perform the contractual duties described in the Hughes–Clark agreement and at the same time deny that J.A. is a party to that agreement in order to avoid arbitration of claims clearly within the ambit of the arbitration clause. In short, plaintiff cannot have it both ways. It cannot rely on the contract when it works to its

advantage, and repudiate it when it works to its disadvantage.

*Id.* at 838–39 (internal quotations and citations omitted). In compelling arbitration, the Seventh Circuit concluded that since "[u]ltimately, therefore, Hughes must rely on the terms of the Hughes–Clark agreement in its claims against J. A...., Hughes is estopped from repudiating the arbitration clause of this agreement, upon which it relies." *Id.* at 841. Other circuit courts of appeal have endorsed this estoppel theory when the asserted claims are "intimately founded in and intertwined with the underlying contract obligations." [16]

Though these cases primarily involve non-signatory defendants seeking to compel arbitration against signatory-plaintiffs, the estoppel rationale is equally applicable in the rare circumstances presented by this case. The Debtor corporation in this case is attempting in its own name to hold the Craig Defendants to the terms of the MTA. Its complaint is, in the words of the Seventh Circuit, "fundamentally grounded" in the alleged breaches of the MTA by the Craig Defendants. As in the cases involving signatory-plaintiffs, this Court concludes that it would be manifestly unjust and inequitable under these circumstances to permit Hydro–Action to assert the benefits of the MTA on its own behalf and to seek enforcement of the Craigs' alleged duties under that agreement, but at the same time to allow Hydro–Action to deny that it is under any duty to arbitrate because it was not an actual signatory to the MTA. Hydro–Action cannot have it both ways. Thus, because of the manifest unfairness which would result otherwise,

**16.** *See, e.g., Long v. Silver*, 248 F.3d 309, 320 (4th Cir.2001) *Grigson v. Creative Artists Agency*, 210 F.3d 524, 527 (5th Cir.), *cert. denied*, 531 U.S. 1013, 121 S.Ct. 570, 148 L.Ed.2d 488 (2000); *McBro Planning and Dev. Co. v. Triangle Elec. Constr. Co.*, 741 F.2d 342, 344 (11th Cir.1984).

Hydro–Action can be compelled to arbitrate its disputes with the Craig Defendants as asserted in this adversary proceeding, even though it is not technically a signatory to the agreement containing the mandatory arbitration clause.

 As to whether the claims asserted by Hydro–Action in this action fall within the scope of the agreement to arbitrate, the Court concludes that they do. The scope of the arbitration provision in the MTA is less definite than the provision in the Employee Agreements only because the precise scope of the MTA itself is rather amorphous. Still, the MTA provision ultimately requires arbitration "to resolve *any* dispute between them and to resolve *any* issue on which they are 'deadlocked'..." Thus, to the extent that Hydro–Action can base its claims against the Craig Defendants upon the provisions of the MTA, those claims are encompassed by the MTA arbitration provision. This conclusion is buttressed by the fact that ambiguities regarding the scope of the arbitration clause are resolved in favor of arbitration [17] and the fact that the Debtor offered absolutely no evidence to demonstrate that the current disputes do not fall within the scope of the respective arbitration provisions.

Instead, the Debtor corporation asserts that this Court should reject the Defendants' demands for arbitration because this dispute is allegedly within the core jurisdiction of this Court and should be decided exclusively in this venue. Placed in the parlance of the jurisprudence in this area, the Debtor asserts that the arbitration of this dispute "would seriously jeopardize the objectives of the Bankruptcy Code." [18]

In support of its proposition, the Debtor cited the decision of *Insurance Company of North America v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re National Gypsum)*, 118 F.3d 1056 (5th Cir.1997). While the *National Gypsum* decision undoubtedly controls this situation, it does not support the Debtor's position. The Fifth Circuit in *National Gypsum* rejected the concept that the core or non-core nature of a proceeding is absolutely determinative of whether arbitration agreements will be enforced in bankruptcy proceedings. Relying on prior directives from the United States Supreme Court that the Federal Arbitration Act mandates enforcement of contractual arbitration provisions in the absence of an inherent conflict with the purpose of another federal statute,[19] the Fifth Circuit stated:

> The core/non-core distinction conflates the inquiry set forth in *McMahon* and *Rodriguez* with the mere identification of the jurisdictional basis of a particular bankruptcy proceeding. Certainly not all core bankruptcy proceedings are premised on provisions of the Code that "inherently conflict" with the Federal Arbitration Act; nor would arbitration of such proceedings necessarily jeopard-

---

17. *See supra* note 11.

18. *See generally, Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149 (3d Cir.1989) [holding that the arbitration of a debtor-derived, non-core adversary proceeding would not so jeopardize the objectives of the Code].

19. *See, e.g. Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 227, 107 S.Ct. 2332, 2337–38, 96 L.Ed.2d 185 (1987)["[I]f Con-

gress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent will be deducible from [the statute's] text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes." (internal quotations and citations omitted) ] and *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).

ize the objectives of the Bankruptcy Code. Although, as appellees suggest, "the core/non-core distinction is a practical and workable one," it is nonetheless too broad. The "discretion" that ACMC and the Trust urge should exist only where a particular bankruptcy proceeding meets the standard for nonenforcement of an arbitration clause set forth in *McMahon* and *Rodriguez*. It is doubtful that "core" proceedings, categorically, meet the standard.

*Id.* at 1067 (citations omitted). Thus, as to whether a bankruptcy court has the discretion to refuse to enforce an otherwise applicable arbitration provision solely because a proceeding happens to fall within its core jurisdiction, the Fifth Circuit reached the following conclusion:

> [W]e refuse to find such an inherent conflict based solely on the jurisdictional nature of a bankruptcy proceeding. Rather, ... we believe that nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceeding, i.e., whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes of the Code. In this regard, ... the discretion enjoyed by a bankruptcy court to refuse enforcement of an otherwise applicable arbitration provision de-

pends upon a finding that the standard set forth in *McMahon* has been met. *Id.* at 1067.

The referenced *McMahon* standard pertains to the proper allocation of the burden of persuasion in this context. The Supreme Court in *McMahon* concluded that:

> The [Federal] Arbitration Act, standing alone, therefore mandates enforcement of agreements to arbitrate statutory claims. Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command. *The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue.*

*McMahon*, 482 U.S. at 227, 107 S.Ct. at 2337 (emphasis added).[20]

■■■ Thus, once it was demonstrated that the claims asserted in the adversary proceeding were actually within the scope of the applicable arbitration provisions, the Debtor, as the party opposing arbitration, assumed the burden to demonstrate that the enforcement of the arbitration provisions would conflict with the actual text or the underlying purposes of the Bankruptcy Code. As the Fifth Circuit has stated, that burden cannot be sustained by the Debtor merely by the fact that the matter before the court is a core proceeding.[21] However, the Debtor failed to produce any evidence to demonstrate the existence of any conflict which precludes the enforcement of the arbitration provisions.[22]

---

**20.** *See also, Rodriguez,* 490 U.S. at 483, 109 S.Ct. at 1921["[T]he party opposing arbitration carries the burden of showing that Congress intended in a separate statute to preclude a waiver of judicial remedies, or that such a waiver of judicial remedies inherently conflicts with the underlying purposes of that other statute."].

**21.** It should be noted that the Court has not actually determined the dispute between the parties as to whether this adversary is, in fact,

a core proceeding, and finds that, in this context, it need not do so.

**22.** Though such a level of analysis was never really invoked by the Debtor's evidentiary presentation, the Fifth Circuit concluded in *National Gypsum* that drawing the line of demarcation as to whether a bankruptcy court is mandated to enforce an otherwise applicable arbitration provision begins by distinguishing between those actions derived from

The Debtor's argument that arbitration must be denied because its complaint now only seeks injunctive relief must also be rejected. It is generally recognized that arbitrators have the power to fashion broad equitable relief, so long as the applicable arbitration rules do not restrict the type of relief which may be awarded.[23] The applicable rules of the American Arbitration Association invoked under the MTA provide, as to employment disputes, that "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable, including any remedy or relief that would have been available to the parties had the matter been heard in court,"[24] and, since the Employee Agreements comprehensively bind the parties to arbitrate "all claims, disputes ... of every kind and nature ...," such expansive language can be reasonably interpreted as an intention of the parties "to resolve through arbitration any dispute that would otherwise be settled in a court, and to allow the chosen dispute resolvers to award the same varieties and forms of damages or relief as a court would be empowered to award." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 61, 115 S.Ct. 1212, 1218, n. 7, 131 L.Ed.2d 76 (1995)[upholding the right of an arbitrator to award punitive damages, though the agreement contained no express reference to punitive damage claims]. Thus, there is no basis for the Debtor's contention that the equitable relief which it seeks is unavailable in the arbitration process.

Therefore, this Court does not possess the discretion to refuse to enforce the arbitration provisions in the contractual agreements presented in this case since there has been no showing whatsoever that enforcement of those provisions would conflict in any way with the purpose or provisions of the Bankruptcy Code. Accordingly, the Court will grant the Defendants' motions and compel the arbitration of the claims asserted in this adversary proceeding. Further, though not actually raised at the hearing, the Court is cognizant that the Defendants have filed corresponding motions to stay the prosecution of this adversary proceeding pending the arbitration of this dispute and the Court finds that, pursuant to 9 U.S.C. § 3, such motions for stay should be granted as well.

This memorandum of decision constitutes the Court's findings of fact and con-

---

the debtor and those created by the Bankruptcy Code. It observed that:

There can be little dispute that where a core proceeding involves adjudication of federal bankruptcy rights wholly divorced from inherited contractual claims, the importance of the federal bankruptcy forum provided by the Code is at its zenith. ... [A]ssuming an otherwise applicable arbitration provision, the adjudication of these actions outside the federal bankruptcy forum could in many instances present the type of conflict with the purpose and provisions of the Bankruptcy Code alluded to in *McMahon*.

*Id.* at 1068. The court concluded that:

We think that, at least where the cause of action at issue is not derivative of the prepetition legal or equitable rights possessed by a debtor but rather is derived solely from the federal rights conferred by the Bankruptcy Code, a bankruptcy court retains significant discretion to assess whether arbitration would be consistent with the purpose of the Code, including the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders.

*Id.* at 1069.

**23.** *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 21, 111 S.Ct. 1647, 1650, 114 L.Ed.2d 26 (1991); *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 939 (10th Cir.2001).

**24.** AAA Employment Disputes Rule 34(d) cited in *Brown v. Coleman Co., Inc.*, 220 F.3d 1180, 1183–84 (10th Cir.2000)

clusions of law [25] pursuant to Fed.R.Civ.P. 52, as incorporated into bankruptcy adversary proceedings by Fed. R. Bankr.P. 7052. Appropriate orders will be entered which are consistent with this opinion.

25. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.