The Reorganized Debtors have argued that it is quite clear that the last iterations of the Sub-Advisory and Shared Services Agreements intended to supersede in every way the prior versions. That includes the provisions directing arbitration. And, they argue, it does not matter when the causes of action occurred/accrued or not. What matters is that the parties agreed at some point that their disputes would not be sent to arbitration and this was the last governing document.
C. The Relevant Language in the Sub-Advisory and Shared Services Agreements Pertaining to (i) Arbitration and (ii) Superseding of Prior Agreements.
As mentioned earlier, there was an arbitration clause at Section 16(f) of the Sub-Advisory Agreement until the last March 17, 2017 version. The clause read as follows:
[I]n the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal *550 Arbitration Act....[23]
In the Shared Services Agreement, an arbitration clause appeared at Section 9.14, as follows:
Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act....[24]
As earlier mentioned, these two agreements were later amended and restated several times. The arbitration provisions remained identical until they were completely eliminated in March 2017. The Reorganized Debtor argues that this is a short analysis: there was no longer an operative arbitration provision as of March 17, 2017.
In the March 17, 2017 version of the Shared Services Agreement, the parties agreed "that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or noncontractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as 'Proceedings') may be brought in such courts."[25]
The same type language appeared in the March 17, 2017 version of the Sub-Advisory Agreement: "The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby."[26]
More generally, the March 17, 2017 versions of the agreements each provided that they "amended, restated and replaced the existing agreements in [their] entirety ."[27] The March 17, 2017 agreements also each provided that they "supersede[d] all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter."[28]
In summary, the Reorganized Debtors argue that, under Texas common law, basic principles of contract interpretation, and the plain language of the March 17, 2017 version of the agreements, there is no agreement to arbitrate. "A contract's plain language controls."[29] Because the prior versions of the agreements were "amended, restated and replaced in [their] entirety" with the March 17, 2017 agreements-which not only omit an arbitration provision, but also expressly provide for jurisdiction and venue in Texas state or federal courts-the Reorganized Debtors argue that there exists no valid agreement to arbitrate between Highland and Acis LP. The court's inquiry can and should end there. But, if the court concludes the arbitration clauses are still applicable, the Reorganized *551 Debtors argue that the bankruptcy court has discretion not to compel arbitration when (a) bankruptcy core matters are involved, and (b) arbitration would conflict with the purposes of the Bankruptcy Code. Therefore, this is further reason why the Arbitration Motion should be denied.
III. Legal Analysis.
A. The Federal Arbitration Act and Arbitration Clauses Generally .
The FAA provides that arbitration agreements are always "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[30] Thus, the FAA reflects a liberal federal policy favoring arbitration, and requires arbitration agreements to be rigorously enforced according to their terms.[31] The FAA "expresses a strong national policy favoring arbitration of disputes, and all doubts concerning the arbitrability of claims should be resolved in favor of arbitration."[32] "There is a strong presumption in favor of arbitration and the party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity."[33]
When considering a motion to compel arbitration, the Fifth Circuit has held there are two threshold questions: (1) whether an arbitration agreement is valid; and (2) whether the dispute falls within the scope of the agreement.[34] To evaluate the enforceability of an arbitration agreement, courts apply the contract law of the state that governs the agreement,[35] whereas the scope of the agreement is a matter of federal substantive law.[36]
B. Is There a Valid Agreement to Arbitrate that Applies Here and is Still Enforceable?[37]
With respect to the first element-whether a valid agreement to arbitrate exists-federal courts "apply ordinary state-law principles that govern the formation of contracts."[38] Here, the choice *552 of law provisions of the Highland-Acis Agreements state: "This Agreement shall be governed by the laws of Texas...."[39] "Under the Texas rules, in those contract cases in which the parties have agreed to an enforceable choice of law clause, the law of the chosen state must be applied."[40] Accordingly, Texas law governs whether the parties are subject to an enforceable agreement to arbitrate.
Here, obviously the parties entered into an agreement to arbitrate in both the Sub-Advisory Agreement (Section 16(f) )[41] and the Shared Services Agreement Section 9.14.[42] And, it would seem to be beyond peradventure that this was, at one time, enforceable between the parties, with regard to any disputes that arose regarding the agreements. The tricky conundrum here is that those arbitration provisions were deleted in the most recent iterations of the agreements-that is, the March 17, 2017 versions of the agreements. Highland argues that, since Counts 1-8 involve alleged overcharges under the agreements in years 2013-2016, and alleged fraudulent transfers up to March 17, 2017 (such fraudulent transfers allegedly occurring by virtue of modifications to the agreements that were made up to March 17, 2017), the pre-March 17, 2017 version of the agreements must be applied with respect to these Counts 1-8 and, thus, the arbitration provisions apply. In other words, what matters is when causes of action accrue not when they are ultimately asserted.
The parties have cited a handful of cases to the court, but the one that the court believes is most analogous is the Coffman v. Provost * Umphrey Law Firm, L.L.P. case.[43] In the Coffman case, the plaintiff was a former non-equity partner of a law firm and brought a lawsuit against the firm and its equity partners, alleging inter alia , breach of contract, breach of fiduciary duty, violations of Title VII and/or the Texas Commission on Human Rights Act ("TCHRA"), and violations of the Equal Pay Act. The law firm filed a motion to compel arbitration with regard to all of these claims. The law firm's motion to compel was based upon various partnership agreements which governed the law firm. The original partnership agreement was first effective on August 26, 1986, and the plaintiff did not sign that agreement. Subsequent to that time, however, the original partnership agreement was amended and restated on several occasions. The plaintiff admitted that she signed four partnership agreement documents: (1) a Restated Partnership Agreement of Provost * Umphrey Law Firm, L.L.P.-Effective January 1, 1994 ("1994 Partnership Agreement"); (2) a Restated Partnership Agreement of Provost * Umphrey Law Firm, L.L.P.-Effective January 1, 1996 ("1996 Partnership Agreement"); (3) an Amendment No. 1 to the Restated Partnership Agreement of Provost * Umphrey Law Firm, L.L.P., Dated January 1, 1996-Effective January 1, 1997 ("1996 Amendment No. 1"); and (4) a Partnership Agreement of Provost * Umphrey Law Firm, L.L.P., As Restated -Effective *553 January 1, 1998 ("1998 Partnership Agreement"). The earlier two agreements-i.e. , the 1994 and 1996 Partnership Agreements-did not contain an arbitration clause. The 1996 Amendment No. 1 and the 1998 Partnership Agreement, on the other hand, both contained an identical arbitration clause as follows:
Binding Arbitration. The equity partners and non-equity partners shall make a good faith effort to settle any dispute or claim arising under this partnership agreement. If the equity or non-equity partners fail to resolve a dispute or claim, such equity or non-equity partner shall submit the dispute or claim to binding arbitration under the rules of the American Arbitration Association then in effect. Judgment on arbitration awards may be entered by any court of competent jurisdiction.[44]
Additionally, all four of the above-referenced partnership agreements contained an integration clause stating that "[t]his agreement contains the entire agreement ... and all prior agreements ... are terminated."[45]
Interestingly, the plaintiff conceded that claims she asserted involving the 1996 Amendment No. 1 and the 1998 Partnership Agreement were required to go to arbitration (such claims requested determinations regarding: (1) the enforceability of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (2) breach of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (3) repudiation; and (4) breach of the duty of good faith and fair dealing). However, the plaintiff disagreed that her remaining claims were also required to go to arbitration and those were: (a) breach of the 1994 and 1996 Partnership Agreements; (b) breach of fiduciary duty; (c) violations of Title VII and/or TCHRA; and (d) violations of the Equal Pay Act. The district court granted in part and denied in part the motion to compel arbitration, holding that: (1) the plaintiff's contract claims arising under earlier partnership agreements, which did not contain arbitration clauses, were not arbitrable ; (2) a common law breach of fiduciary duty claim was arbitrable under the agreements (it appears that these claims arose after the 1996 Amendment No. 1 and 1998 Partnership Agreement); and (3) statutory sex-based discrimination claims were not arbitrable under the agreements.[46]
Relevant to the case at bar, the Coffman court noted, first, that the conduct underlying the alleged breaches of the 1994 and 1996 contracts occurred at a time when no arbitration clause was in effect. The plaintiff's complaint specifically alleged that, during the time the four agreements were in effect, the law firm failed to properly calculate Plaintiff's compensation, failed to promote her, and deprived her of benefits from a tobacco case. The court noted that, if the law firm did participate in such conduct during the time that the 1994 and 1996 Partnership Agreements were in effect, such conduct could not have "arisen under" the 1996 Amendment No. 1 or the 1998 Partnership Agreement because those agreements did not even exist at that time . But, to the extent that the conduct Plaintiff complained of occurred when the 1996 Amendment No. 1 and the 1998 Partnership Agreement were in effect, her claims would be subject to arbitration.[47]
*554 The court further noted that the arbitration clause should not be interpreted as covering the plaintiff's claims for breach of the 1994 and 1996 Partnership Agreements because the plain grammatical language of the arbitration clause gave no indication that it would apply retroactively. "To interpret the arbitration clause to apply retroactively would cause Plaintiff to forego her vested right to litigate an accrued claim."[48]
Bottom line, the court in Coffman seemed to focus on when each cause of action accrued and looked to the agreement that governed at such time . This court agrees with that reasoning and sees no reason why the result should be different in the case at bar, simply because the arbitration clauses in the case at bar were in earlier versions of the Sub-Advisory and Shared Services Agreements as opposed to being in the later versions of those agreements (in other words, the opposite sequence as in the Coffman case).
The Reorganized Debtors have cited a couple of cases that they believe justify a determination that there is no binding arbitration clause in the case at bar. One is the case of Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.[49] This case involved a motion to compel arbitration that was denied (which denial was affirmed by the Fifth Circuit). Like the case at bar, it involved a situation where there had been a succession of agreements, with earlier agreements containing arbitration provisions and the last agreement containing no arbitration clause. Specifically, in the Goss-Reid case, there were three agreements that were relevant. First, a Franchise Agreement between a franchisor named Transformational Technologies, Inc. ("TTI") and a party named Rittenhaus-Tate Organization ("RTO"). RTO was a business owned by Tracy Goss and Sheila *555 Reid. The Franchise Agreement, among other things, provided that RTO's owners Tracy Goss and Sheila Reid would be "licensed franchisees of TTI" and would have use of certain of TTI's intellectual property. During the term of the Franchise Agreement, Tracy Goss and Sheila Reid developed certain consulting services technology they called "The Winning Strategy" and it apparently was built off of TTI's intellectual property. This first agreement contained a mandatory arbitration provision. Second, there was a License Agreement between the apparent successor-in-interest of TTI called Tekniko, Inc., on the one hand, and Tracy Goss, Sheila Reid and Goss-Reid & Associates, Inc. (collectively, "Goss/Reid"), on the other, pursuant to which Goss/Reid obtained a "a non-exclusive license to use the same intellectual property covered by the Franchise Agreement." This second agreement also contained a mandatory arbitration agreement. Third, there was a Transfer Agreement that appears to have been entered into by the same parties as the second agreement (Tekniko, Inc. and Goss/Reid). The Transfer Agreement "permanently transferred [to Goss/Reid] the non-exclusive right to use the intellectual property that was the subject of the prior agreements in exchange for a percentage of [Goss & Reid's] adjusted gross profits for that year." There was no arbitration provision in this third agreement and the agreement did not adopt or refer to the arbitration provisions contained in the earlier agreements. The third agreement stated that it constituted "an amendment to the License Agreement ... between you and this company ('TEKNIKO'), supersedes all prior agreements between you and TEKNIKO and, except as provided below, will terminate your rights and those of TEKNIKO under the License Agreement."
At some subsequent time, Goss/Reid filed a lawsuit alleging improper use of "The Winning Strategy" by the entities Tekniko Licensing Corporation and Landmark Education Company. These Defendants (hereafter so called) asserted ownership themselves of "The Winning Strategy" based on the Franchise Agreement. The Defendants-citing to the arbitration clauses in both the Franchise Agreement and the License Agreement-filed a motion to compel arbitration, which was denied at the district court level and also at the Fifth Circuit. The district court determined that New York law applied (i.e. , the Transfer Agreement was governed by New York law and apparently the parties agreed that New York law applied), and that the Transfer Agreement constituted a novation and extinguished the arbitration provisions of the previous agreements. On appeal, the Fifth Circuit stated that the issue before it was "whether the arbitration provisions of the Franchise and License Agreements were superseded by the Transfer Agreement. Thus, the question before us is one of contractual interpretation."[50]
The Fifth Circuit stated certain principles that apply under both New York and Texas law. Among other principles, the Fifth Circuit noted that courts construing contracts "should strive to give effect to the intentions of the parties, as expressed in the terms of the contract."[51] The Transfer Agreement stated that "it supersedes all prior agreements" between Goss/Reid and the predecessor-in-interest of one of the Defendants, Tekniko Licensing Corporation.[52] "This type of agreement clearly constitutes a novation under New York *556 law."[53] The court also noted that it was not appropriate to consider any extrinsic or parol evidence, since there was no ambiguity in the Transfer Agreement. The court further stated that "[t]he only potential ambiguity raised by the Defendants is that the Transfer Agreement refers to itself as an 'amendment to the License Agreement.' Read as a whole, however, the Transfer Agreement plainly manifests an intention to supersede all prior agreements between the parties and, except as specifically provided, to terminate all rights and obligations under the License Agreement."[54]
The other case that the Reorganized Debtors have significantly relied upon to justify a determination that there is no binding arbitration clause in the case at bar is Valero Energy Corp. v. Teco Pipeline Co.[55] In Valero , there had been numerous agreements entered into over time amongst the litigating parties, all of which involved gas pipelines and transportation rights, and those various agreements were not amendments or restatements of one initial agreement. Rather, there was an Operating Agreement, there were documents that were alleged to create a joint venture or partnership, a Purchase Agreement, an Ownership Agreement, a Transportation Agreement, and a couple of Settlement Agreements entered into later when various disputes arose. One of the key agreements, the so-called Operating Agreement, contained an arbitration clause. When party Teco Pipeline sued party Valero and other related parties, Valero moved to compel arbitration, arguing that the litigation was subject to the arbitration clause in the Operating Agreement. The trial court denied Valero's motion, but the court of appeals reversed.
Teco had argued that the claims it was asserting were not based on the Operating Agreement that contained the arbitration clause but, even if they were, a later Settlement Agreement essentially redefined the parties' relationship-essentially superseding the parties' relationship that had been set forth in the numerous prior agreements-and it did not have an arbitration clause. Rather the Settlement Agreement stated that:
Each party irrevocably consents and agrees that any legal action, suit or proceeding against any of them with respect to their obligations, liabilities, or any other matter under or arising out of or in connection with this Agreement may be brought in the United States District Court for the Western District of Texas, San Antonio Division, or in the courts of the State of Texas, and hereby irrevocably accepts and submits to the jurisdiction of each of the aforesaid court in personam, generally and unconditionally with respect to any such action, suit or proceeding for itself and in respect of its properties, assets and revenues.[56]
Teco asserted that the quoted clause provided for the procedure to be used in future disputes, i.e. , that the parties would go through judicial channels, not arbitration. Teco also asserted that the intent to revoke the arbitration clause was signified by a typical merger clause contained in the Settlement Agreement. The appeals court disagreed with Teco's argument and determined arbitration was required. First, the court determined that the provision regarding *557 litigation applied only to disputes arising under the Settlement Agreement not the previously executed Operating Agreement, Purchase Agreement, Ownership Agreement, or Transportation Agreements. There was nothing to indicate that all the terms of those previous agreements had been superseded by the Settlement Agreement. In fact, it appeared that only select terms of the earlier agreements were being modified. Significantly, the Settlement Agreement referred to an "Amendment No. 1" to the Operating Agreement being attached as an Exhibit D to the Settlement Agreement-suggesting that it remained in intact (except for the amendment attached). Moreover, there was a post-Settlement Agreement letter submitted into evidence stating that the prior Operating Agreement and arbitration provision were still in effect. The court addressed many other arguments made by Teco and, in the end, found nothing had superseded or otherwise revoked the prior arbitration clause.
This bankruptcy court does not consider the Valero or Goss-Reid cases to be dispositive of the situation in the case at bar. Those cases clearly dealt with a myriad of agreements-for example, in Valero , one key agreement had an arbitration clause, and an allegedly superseding Settlement Agreement (with no arbitration clause) was determined not to have been intended to supersede or replace the agreement with the arbitration clause. In Goss-Reid , there were also a myriad of agreements (i.e. , a franchise agreement, a license agreement and then a transfer agreement), and the last one containing no arbitration clause was held to have been a novation of the prior agreements. In Valero and Goss-Reid , the various agreements were not amendments or restatements of one initial agreement. The case at bar is more analogous to the Coffman case (involving amendments and restatements of an initial agreement) and the logic of that holding seems sound to apply here-especially given the fact that there is nothing in the March 17, 2017 version of the agreements that suggests that the agreement to submit disputes to litigation in Texas and the deletion of the arbitration clauses should be applied retroactively. The court believes it should look at when a cause of action accrued and determine if there was a binding arbitration clause between the parties at that time in the governing version of the agreement. Thus, the court determines that there were valid arbitration agreements that applied to all disputes arising out of the Sub-Advisory Agreement and Shared Services Agreement-to the extent that those disputes involved conduct prior to March 17, 2017. Since Counts 1-8 involve conduct prior to March 17, 2017, Counts 1-8 fall within the scope of the arbitration agreements in the Sub-Advisory Agreement and Shared Series Agreement.
C. But Wait, this is Bankruptcy and Core Matters and a Proof of Claim Objection are Involved.
The analysis does not end here. Yes, there is an otherwise valid, binding arbitration clause that was contained in each of the Sub-Advisory and Shared Services Agreements (prior to March 17, 2017). And, yes, Counts 1-8 involve conduct and disputes arising under these pre-March 17, 2017 agreements. But what about the fact that these disputes arise in an adversary proceeding that involves mostly, if not entirely, "core" matters (e.g. , Counts 5-25 are all fraudulent transfers or preference claims under Section 544,[57] 547,[58] or 548 ;[59]
*558 Count 2 is a Section 542 turnover request;[60] Count 26 is a request for Section 550 recovery[61] )? And what about the fact that Highland (the counter-party to the Sub-Advisory and Shared Services Agreement who has asked for enforcement of the arbitration clauses in those agreements) has filed proofs of claim?[62] And what about the fact that Counts 1-8 (as with every count in the Adversary Proceeding) are all urged to be offsets to Highland's proofs of claim?[63] Highland's proofs of claim are based on the post-March 17, 2017 versions of the Sub-Advisory and Shared Services Agreements (i.e. , the versions that have no arbitration clauses). Highland has not argued that its proofs of claim are subject to arbitration (likely because they are governed by the post-March 17, 2017 versions of the Sub-Advisory and Shared Services Agreements). But, again, Highland argues that Counts 1-8 must be sent to arbitration, and the Reorganized Debtors argue that each of these counts present potential offsets to Highlands' proofs of claim. As a reminder, these counts are:
COUNT 1 : Declaratory Judgment of Ultra Vires Acts by Acis LP in Violation of the LPA (Highland allegedly overcharged expenses by $ 7M+ (i.e. , excessive fees) under the Sub-Advisory and Shared Services Agreements).
COUNT 2 : Turnover of Property of the Estate Under § 542 for Unauthorized Overpayments (turnover the $ 7M+ overcharged).
COUNT 3 : Money Had and Received for Overcharges and Unauthorized Overpayments (again, seeking redress for the $ 7M+ overcharged-implicating the Sub-Advisory Agreement and Shared Services Agreement).
COUNT 4: Conversion for Unauthorized Overpayments (again, seeking redress for the $ 7M+ overcharged implicating the Sub-Advisory Agreement and Shared Services Agreement).
COUNT 5 : Actual Fraudulent Transfer under § 548 related to the Sub-Advisory Agreement (modifications to the Sub-Advisory Agreement in subsequent iterations were allegedly fraudulent transfer, as were payments thereunder).
COUNT 6 : Actual Fraudulent Transfer Under TUFTA, § 24.005(a)(1) related to the Sub-Advisory Agreement (same theory as Count 5, asserted through section 544 of the Bankruptcy Code ).
COUNT 7 : Constructive Fraudulent Transfer Under § 548(a)(1)(B) related to the Sub-Advisory Agreement (same facts as Count 5 only constructive not actual fraud).
COUNT 8 : Constructive Fraudulent Transfer Under TUFTA §§ 24.005(a)(2) and 24.006(a) related to the Sub-Advisory Agreement (same facts as Count 5, only constructive fraud under TUFTA, and asserted through section 544 of the Bankruptcy Code ).
Thus, to recap, five of the eight counts that Highland wants arbitrated (Counts 2, and 5-8) clearly involve statutory core matters.[64] Moreover, all of the counts in the Adversary Proceeding are asserted defensively to two proofs of claim-meaning all eight counts that Highland wants arbitrated (even Counts 1, 3, and 4) have transformed into statutory core matters.[65] Does this matter? This court believes yes.
*559 The Fifth Circuit has shed some light on this topic in the cases of In re Gandy and In re National Gypsum .[66] In those cases, the Fifth Circuit instructed that a bankruptcy court may decline to enforce arbitration clauses when it finds: (a) the underlying nature of the proceeding derives from the provisions of the Bankruptcy Code; and (b) that enforcement of the arbitration provision would conflict with the purposes/goals of the Bankruptcy Code.[67] Some purposes/goals of the Code that might support a denial of arbitration, include: (1) the equitable and expeditious distribution of assets of the Debtor's estate; (2) centralized resolution of pure bankruptcy issues; (3) protection of creditors and reorganizing debtors from piecemeal litigation, and (4) the undisputed power of a bankruptcy court to enforce its orders.[68]
The In re Gandy opinion from the Fifth Circuit is worthy of discussion here. In Gandy , an individual Chapter 11 debtor had first, prepetition, filed a state court lawsuit against various business partners, asserting causes of action against them for making transfers out of a partnership affecting her ownership interests, and the causes of action included breach of contract, negligence, breach of fiduciary duty, fraud and constructive trust. There was an arbitration clause in the applicable partnership agreement and the state court granted a motion to compel arbitration. Then, the debtor filed a Chapter 11 case and removed the state court lawsuit to the bankruptcy court and filed new claims under sections 544, 548, 550, civil "RICO," and alter ego in a separate adversary proceeding, and requested substantive consolidation. The bankruptcy court granted consolidation of the two actions and then the defendants filed a motion to compel arbitration. The bankruptcy court denied the motion, after finding that the debtor was essentially seeking avoidance of fraudulent transfers. The Fifth Circuit affirmed the bankruptcy court's refusal to enforce an arbitration clause contained in the underlying partnership agreement. The court agreed with the bankruptcy court that the complaint essentially-more than anything *560 else-sought avoidance of fraudulent transfers, and the court not only determined that such rights derived from the Bankruptcy Code (fully acknowledging the fact that there were state law tort claims and breach of contract also asserted) but also-in looking at whether enforcing the arbitration clause would conflict with the purposes of the Bankruptcy Code-noted that one central purpose of the Bankruptcy Code is the expeditious and equitable distribution of the assets of a debtor's estate. The court thought the avoidance actions predominated over the "peripheral" contract and tort claims and, in such a circumstance, "the importance of the federal bankruptcy forum provided by the Code is at its zenith."[69] The court stated that "[s]ome of the purposes of the Code we mentioned in National Gypsum[70] as potentially conflicting with the Arbitration Act include the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of the bankruptcy court to enforce its own orders."[71]
This court believes, like the court in Gandy , that this Adversary Proceeding-more than anything else-seeks avoidance of fraudulent transfers. Such avoidance theories derive from the Bankruptcy Code. Sections 542, 547, 548 and 550 of the Bankruptcy Code are front and center, as are the "strong arm" powers of section 544(a). Enforcing the arbitration clause here would conflict with the purposes of the Bankruptcy Code-one of the central purposes of which is the expeditious and equitable distribution of the assets of a debtor's estate. The avoidance actions in this Adversary Proceeding predominate over all other counts and, in such a circumstance, "the importance of the federal bankruptcy forum provided by the Code is at its zenith." Arbitrating Counts 1-8 would seriously jeopardize the Adversary Proceeding because they are an integral part of determining Highland's proofs of claim and the other core counts in the Adversary Proceeding. The bankruptcy court's quintessential duties are to adjudicate proofs of claim and to provide a central forum for litigation, whenever feasible and jurisdictionally sound. Indeed, in Gandy , the Fifth Circuit noted that when a proof of claim is filed, one of the "peculiar powers" of the bankruptcy court has been invoked and the nature of estate claims becomes "different from [their] nature ... following the filing of a proof of claim."[72]
In summary, this court believes it has discretion under established Fifth Circuit *561 authority to decline to order arbitration here.[73] It is, therefore,
ORDERED that the Arbitration Motion is DENIED .

Exh. 1 of Arbitration Motion, at 7-8.

Exh. 6 of Arbitration Motion, at 9-10.

Exh. 10 of Arbitration Motion, § 8.04(b).

Exh. 5 of Arbitration Motion, § 13.

Exhs. 5 and 10 of Arbitration Motion, each at p. 1 (emphasis added).

Exh. 5 of Arbitration Motion, ¶ 20; Exh.10 of Arbitration Motion, ¶ 8.14.

Great Am. Ins. Co. v. Primo , 512 S.W.3d 890, 893 (Tex. 2017).

9 U.S.C. § 2.

See AT & T Mobility LLC v. Concepcion , 563 U.S. 333, 339, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011) (citations omitted).

Primerica Life Ins. Co. v. Brown , 304 F.3d 469, 471 (5th Cir. 2002) (citing Southland Corp. v. Keating , 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) ).

Carter v. Countrywide Credit Indus., Inc. , 362 F.3d 294, 297 (5th Cir. 2004).

See Agere Sys. Inc. v. Samsung Elecs. Co. Ltd. , 560 F.3d 337, 339 (5th Cir. 2009).

Wash. Mut. Fin. Group, LLC v. Bailey , 364 F.3d 260, 264 (5th Cir. 2004) (citation omitted).

Graves v. BP Am., Inc. , 568 F.3d 221, 222-23 (5th Cir. 2009) ; see also Neal v. Hardee's Food Sys., Inc. , 918 F.2d 34, 37 (5th Cir. 1990) (under federal law, courts "resolve doubts concerning the scope of coverage of an arbitration clause in a contract in favor of arbitration," and arbitration should not be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue").

The court is assuming, without analysis, that the Chapter 11 Trustee (and the Reorganized Debtors) are bound by the arbitration clauses, if Acis LP affirmatively agreed to be bound by them and would still be bound by them outside of bankruptcy. Case law has stated that a bankruptcy trustee "stands in the shoes of the debtor for the purposes of [an] arbitration clause" and "the trustee-plaintiff is bound by the clause to the same extent as would the debtor." Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc. , 885 F.2d 1149, 1153 (3d Cir. 1989) ; see also Janvey v. Alguire , No. 3:09-CV-0724-N, 2014 WL 12654910 at *6 (N.D. Tex. July 30, 2014) (quoting Hays ).

First Options of Chi., Inc. v. Kaplan , 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) ; see also Wash. Mut. Fin. Grp., LLC v. Bailey , 364 F.3d 260, 264 (5th Cir. 2004).

See, e.g. , Exh. 1 to Arbitration Motion, § 16(a); Exh. 5 to Arbitration Motion, § 13; Exh. 6 to Arbitration Motion, § 9.05; Exh. 10 to Arbitration Motion, § 8.04(a).

Resolution Trust Corp. v. Northpark Joint Venture , 958 F.2d 1313, 1318 (5th Cir. 1992) (citing DeSantis v. Wackenhut Corp. , 793 S.W.2d 670, 678 (Tex. 1990) ).

Exhs. 1-4 of the Arbitration Motion.

Exhs. 6-9 of the Arbitration Motion.

Coffman v. Provost * Umphrey Law Firm, L.L.P. , 161 F.Supp.2d 720 (E.D. Tex. 2001).

Id. at 723.

Id.

Id. at 733.

Id. at 726 (citing Sec. Watch, Inc. v. Sentinel Sys., Inc. , 176 F.3d 369, 372 (6th Cir. 1999) (arbitration provision in 1994 shipping agreement did not cover conduct that occurred under prior shipping agreements); Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp. , 348 F.2d 693, 698 (2d Cir. 1965) (claim based on conduct which had arisen "prior to" effective date of arbitration clause was not within scope of arbitration agreement); Hendrick v. Brown & Root, Inc. , 50 F.Supp.2d 527, 533-34 (E.D.Va. 1999) (arbitration clause in fourth contract did not cover conduct that occurred when third contract was in effect); Connett v. Justus Enters. of Kansas, Inc. , Civ. A. No. 87-1739-T, 1989 WL 47071, at *2 (D. Kan. March 21, 1989) (arbitration clause did not apply when alleged fraudulent conduct occurred before plaintiff executed contract with arbitration clause); George Wash. Univ. v. Scott , 711 A.2d 1257, 1260-61 (D.C. Ct. App. 1998) (conduct that occurred before arbitration clause took effect was not arbitrable).

Coffman , 161 F.Supp.2d at 726-27 (citing Sec. Watch , 176 F.3d at 372-73 (arbitration clause did not reach disputes arising under earlier agreements because it is "nonsensical to suggest that [the plaintiff] would abandon its established right to litigate disputes arising under the [prior] contracts"); Choice Sec. Sys. v. AT & T Corp. , No. 97-1774, 1998 WL 153254, at *1 (1st Cir. Feb. 25, 1998) (arbitration clause in 1994 contracts did not apply to pre-1994 contracts when the language of the arbitration clause did not indicate "that the parties ever contemplated so radical a retroactive renegotiation of their earlier agreements"); Hendrick , 50 F.Supp.2d at 535 (arbitration clause was not retroactive when the text of the clause expressed no language providing that it "reache[d] back in time to require an employee to arbitrate a claim which had accrued before the contract was signed or the [arbitration clause] took effect"); Connett , 1989 WL 47071, at *2 (arbitration clause did not apply retroactively when it did not specify that it applied to past conduct); Kenworth of Dothan, Inc. v. Bruner-Wells Trucking, Inc. , 745 So.2d 271, 275-76 (Ala. 1999) (arbitration clause was not retroactive when language of the clause did not so state); George Wash. Univ. , 711 A.2d at 1261 (arbitration clause was not retroactive when "the arbitration clause itself contained no indication whatsoever that its terms would apply ... before [its effective date]").

Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp. , 54 Fed. Appx. 405 (5th Cir. 2002) (per curium opinion which is designated as having no precedential effect).

Id. at *1.

Id.

Id.

Id. (citing various New York state court cases).

Id. at *2.

Valero Energy Corp. v. Teco Pipeline Co. , 2 S.W.3d 576 (Tex. App.-Houston [14th Dist.] 1999, pet. denied).

Id. at 587.

See 28 U.S.C. § 157(b)(2)(H).

See 28 U.S.C. § 157(b)(2)(F).

See 28 U.S.C. § 157(b)(2)(H).

See 28 U.S.C. § 157(b)(2)(E).

See 28 U.S.C. § 157(b)(2)(F) & (H).

See 28 U.S.C. § 157(b)(2)(B).

See 28 U.S.C. § 157(b)(2)(C).

See 28 U.S.C. § 157(b)(2)(E), (F), and (H).

See 28 U.S.C. § 157(b)(2)(C). This court realizes that, from a Stern v. Marshall perspective, 564 U.S. 462, 131 S. Ct. 2594, 180 L.Ed.2d 475 (2011), being a statutory "core" matter does not necessarily mean a bankruptcy court has Constitutional authority to issue final orders or judgments in the matter. However, even if this Stern pronouncement has any relevance, when evaluating an arbitration clause/right, the court perceives that the various counterclaims here (i.e. , all 35 counts) are likely inexplicably intertwined with the Highland proofs of claim, such that the bankruptcy court would likely have Constitutional authority to adjudicate them. While Highland's proofs of claim merely seek payment for services under the post-March 17, 2017 versions of the agreements-which is after the time frame that Counts 1-8 implicate-it is not so simple as dividing claims and counterclaims into discreet time periods. For one thing, the Reorganized Debtors argue that modifications to the Sub-Advisory and Shared Services Agreements that increased fees that Highland could charge (and that Highland is now seeking in its proofs of claim) were tantamount to fraudulent transfers. Thus, how does one evaluate the proofs of claim separately from this argument? Additionally, Highland has asserted unliquidated indemnification claims in its proofs of claim that presumably reach back to earlier iterations of the Sub-Advisory and Shared Services Agreement (meaning that claims ultimately awarded to the Reorganized Debtors under earlier versions of the agreements might result in indemnification claims being asserted back against them by Highland relating to those very claims). The point being that all of Highland's assertions in its proofs of claim seem inextricably intertwined with all the Counts in the Adversary Proceeding.

Gandy v. Gandy (In re Gandy) , 299 F.3d 489 (5th Cir. 2002) ; Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.) , 118 F.3d 1056 (5th Cir. 1997).

Id. at 1069.

Id.

Gandy , 299 F.3d at 497.

In the National Gypsum case, an asbestos litigation trust created under a confirmed plan filed a post-confirmation adversary proceeding against debtor's liability insurer, seeking a declaratory judgment that the plan had discharged its obligations to the insurance company. The insurance company, in response to the litigation, sought to exercise its rights to seek arbitration under a certain agreement. The Fifth Circuit, in affirming the lower courts' refusal to compel arbitration, stated that, "We believe that nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceeding, i.e. , whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes of the Code." Nat'l Gypsum Co. , 118 F.3d at 1067. Because the debtor sought to bar the insurance company's actions either by invoking section 524(a)'s discharge injunction or by invoking the terms of a confirmed plan, the proceeding derived entirely from the provisions of the Bankruptcy Code, and, hence, the National Gypsum court would not send the dispute to arbitration.

Gandy , 299 F.3d at 500.

Id. at 499 (citing Wood v. Wood (In re Wood) , 825 F.2d 90, 97 (5th Cir. 1987) ).

See also Anderson v. Credit One Bank, N.A. (In re Anderson) , 884 F.3d 382, 389-90 (2d Cir. 2018) (in proceeding involving whether section 524 discharge was violated by credit card company whose agreement with debtor contained arbitration clause, Second Circuit held that bankruptcy court had discretion to decline to enforce the arbitration agreement; Second Circuit engaged in a particularized inquiry into the nature of the claim and the facts of the specific bankruptcy and determined that arbitrating claims for violations of the 524 injunction would "seriously jeopardize a particular core bankruptcy proceeding" because: "(1) the discharge injunction is integral to the bankruptcy court's ability to provide debtors with a fresh start, (2) the claim relates to an ongoing matter with continuing court supervision, and (3) the equitable powers of the court to enforce its own injunctions are central to the structure of the Code.").